In re MARRIAGE OF LYNN ROSE THOMAS, Petitioner-Appellee, and PAUL MICHAEL THOMAS, Respondent-Appellant.

Second District    No. 2—02—0302

Opinion filed May 5, 2003.

216

Lyle B. Haskin and Barbara Ann Corrigan, both of Haskin & Corrigan, L.L.C., of Wheaton, for appellant.

Lee A. Marinaccio, of Botti, Marinaccio & DeLongis, Ltd., of Oak Brook, for appellee.

JUSTICE BYRNE delivered the opinion of the court:

Respondent, Paul Michael Thomas, appeals from the circuit court's decisions to (1) exclude certain documentary evidence of his 1984 income as a sanction for failing to personally appear at the evidentiary hearing; (2) award petitioner, Lynn Rose Thomas, $317,753.72 in past-due support and $75,000 in attorney fees and costs; and (3) allow Lynn to recover the arrearage via qualified domestic relations orders (QDROs).

We conclude that the trial court calculated the arrearage incorrectly because the court abused its discretion in excluding the contested evidence. However, the court did not abuse its discretion in awarding the attorney fees and costs. We further determine as a matter of law that the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 *et seq.* (West 2000)) permits the entry of QDROs to transfer the value of pension and retirement accounts to satisfy a support arrearage. However, such an assignment is limited to the value of the accounts at the time of the marriage dissolution. Because it is unclear whether the QDROs in this case were so limited, we reverse them and remand the cause for the entry of new QDROs. Accordingly, we affirm the judgment in part, reverse it in part, and remand the cause for further proceedings consistent with this opinion.

## FACTS

Because the parties are familiar with the extensive background of the case, we set forth only those facts relevant to the appeal. On May 13, 1981, the trial court entered an order dissolving the parties' 13-year marriage. At the time of the dissolution, Paul was 35 years old, Lynn was 31 years old, and the parties' only child, Andrew, was 9 years old.

The settlement agreement established Paul's initial family support obligation at $800 per month. The agreement further provided that, after 36 months, the support obligation would change to $650 per month or 35% of Paul's net income, whichever was greater. Thereafter, Paul's support obligation would be reduced by $200 per month upon Andrew's emancipation or upon Lynn's remarriage.

On February 5, 1999, the trial court entered an order finding a change in circumstances that warranted a modification of the original dissolution order. The court (1) increased the amount of Lynn's maintenance to $3,062 per month; (2) found that Paul had wilfully underpaid his maintenance obligation from 1989 through 1998 in the amount of $227,223.32; (3) ordered Paul to pay Lynn the arrearage plus statutory interest; (4) ordered Paul to give Lynn 2,424 shares of Citigroup stock and all dividends received on those shares plus inter-

est; (5) ordered Paul to reimburse Lynn $23,000 plus interest for Andrew's education expenses; and (6) found Paul in contempt of court. On September 17, 1999, the trial court preliminarily enjoined Paul from withdrawing, transferring, or assigning any of his assets, including pension and retirement funds, to insure his payment of the arrearage. Paul appealed, arguing that the findings and orders were against the manifest weight of the evidence and an abuse of discretion. *In re Marriage of Thomas*, Nos. 2—99—0396, 2—99—1085 cons. (2000) (unpublished order under Supreme Court Rule 23).

On March 29, 2000, we (1) reversed the trial court's order setting the support arrearage and ordering Paul to transfer the stock; (2) found that we lacked jurisdiction to review the contempt finding because it was not final; (3) affirmed the portions of the judgment increasing the monthly maintenance obligation to $3,062 and requiring Paul to reimburse Lynn for Andrew's educational expenses; and (4) reversed the order enjoining Paul from accessing his assets. *Thomas*, slip order at 41-42.

In reversing the arrearage finding, we emphasized that the trial court had incorrectly calculated Paul's support obligation from June 1984 until Andrew's emancipation in September 1989. In June 1984, which was 36 months after the entry of the dissolution judgment, Paul's monthly support obligation was to be the greater of $650 or 35% of his net income. It was impossible to calculate Paul's modified support obligation because the parties did not introduce evidence of Paul's net income in June 1984. Under the agreement, "net income" consisted of gross income minus all federal and state taxes. *Thomas*, slip order at 24. We directed the trial court to recalculate the obligation and any possible arrearage "based upon a comparison between 35% of Paul's net income in June 1984 and the $650 payment amount, and by making the necessary modifications following Andrew's emancipation." *Thomas*, slip order at 22-23. We stated that, "[o]n remand, the parties shall have an opportunity to introduce evidence of Paul's net income as of June 1984." *Thomas*, slip order at 24. We also directed the court to recalculate the number of shares of Citigroup stock to which Lynn was entitled. *Thomas*, slip order at 28. The stock is not at issue in this appeal.

On remand to the circuit court, it soon became apparent that the parties lacked documentary evidence of Paul's net income in June 1984. Paul's counsel told the trial court that neither the Internal Revenue Service (IRS) nor the Illinois Department of Revenue could provide copies of Paul's 1984 income tax return because those agencies do not retain such documentation that is more than 10 years old. Pursuant to Supreme Court Rule 237(b) (166 Ill. 2d R. 237(b)), Lynn

filed a notice for Paul to appear and produce his 1984 tax returns. Paul had moved to South Carolina before the February 1999 proceedings concluded, and, although he was represented by local counsel, he did not personally appear in court at any time thereafter.

At a hearing on July 19, 2001, Paul's counsel filed an affidavit in which Paul stated that the 1984 tax returns had not been in his possession or under his control since January 1995. The trial judge expressed displeasure with Paul's absence and stated that he would consider imposing an "appropriate sanction."

On July 26, 2001, the next court date, Paul's counsel argued that his client's presence was unnecessary because he lacked personal knowledge of the June 1984 net income, which was the only evidentiary issue to be decided. Paul executed consent forms to authorize the release of information from the IRS and the Illinois Department of Revenue regarding the 1984 income. The judge remarked at the close of the hearing that "until [Paul] obeys the lawful orders of the court [to appear], we are stuck in trial without our first witness."

On November 13, 2001, Lynn's counsel told the court that an IRS agent informed him that Paul's complete 1984 return was unavailable. However, the agency would send a transcript of limited information reporting Paul's adjusted gross income, taxable income, taxes paid, and refund for 1984. Paul's counsel offered to stipulate to the IRS transcript once it arrived, but the court expressed concern that the transcript would merely report Paul's adjusted gross income rather than his total gross income. Paul later submitted a request to the Social Security Administration (SSA) for the release of his income and benefits records from 1984. The trial judge later expressed frustration with the delay and ruled that "[Paul] will appear and give truthful testimony, or we shall apply the teaching of [*In re Marriage of Marks*, 96 Ill. App. 3d 360, 362 (1981) (citing the rule that a party who refuses to obey the mandate of the trial court and who has been adjudged in contempt for such refusal may not defend an action when the contempt hinders or embarrasses the due course of procedure in the cause)]."

On December 6, 2001, the next scheduled hearing date, the judge ruled that, because Paul had failed to appear, the court would use evidence of Paul's net income in 1989 for determining whether 35% of that year's monthly net income was more or less than $650. The court used the 1989 evidence because it most recently followed 1984 and had been admitted and subjected to cross-examination at the 1999 trial. The court believed that, under *Marks*, Paul's failure to comply with the notice to appear precluded him from challenging the court's procedure for determining his 1984 income.

The transcript of the January 16, 2002, hearing indicates that

Paul's counsel offered a copy of the IRS transcript, and that the trial court excluded it from evidence because Paul was not present to testify that the transcript reflected all of his employment in 1984. We have not found the IRS transcript in the appellate record. However, the appellate record contains an abstract certified by the SSA stating that Paul's 1984 income was $37,800 and that "there are no other earnings recorded under this social security number for the period(s) requested." The trial court also refused to use the SSA abstract to calculate Paul's obligation.

Following argument, the court entered a judgment of $317,753.72 for Lynn, which represented Paul's total arrearage as of January 5, 2002. The amount included (1) $175,487.22 in past-due maintenance from June 1984 through January 31, 1999; (2) $105,639 in past-due maintenance from February 5, 1999, through January 5, 2002; and (3) $36,627.50 for Andrew's education reimbursement, including interest. The court granted Lynn leave to file proposed QDROs attaching Paul's pension and retirement accounts for the purpose of collecting the arrearage. Finally, the court quashed all of the previous rules to show cause and other writs of attachment against Paul.

On February 13, 2002, the trial court decided Lynn's petition for attorney fees and costs, in which she claimed $107,172.30 for litigation expenses accruing since the postdecree proceedings began in 1994. Paul challenged the specificity with which Lynn's counsel itemized the expenses in the petition, and he further argued that Lynn should not recover the entire cost of the first appeal because she did not prevail on every issue. After noting that Paul himself had accrued $80,000 in fees and costs during the relevant period, the court awarded Lynn $75,000 as reasonable expenses.

On February 21, 2002, the court entered QDROs affecting (1) Paul's 401(k) plan in the Oracle corporation, (2) Paul's Vanguard Group individual retirement account (IRA), and (3) Paul's "American National Can Combined Pension Plan 034." The trial judge also announced that he was closing the case. On March 21, 2002, Paul filed a notice of appeal, but on April 15, 2002, the trial court entered an amended QDRO that transferred the entire accrued benefit of the "American National Can Combined Pension Plan 034" to Lynn.

## ANALYSIS

### 1. Motion to Dismiss

■ Lynn has filed a motion to dismiss the appeal pursuant to Supreme Court Rule 361 (177 Ill. 2d R. 361), and we ordered the motion and Paul's response to be taken with the case. Lynn contends that the appeal must be dismissed because "[Paul] has been found in

contempt by the trial court, the order finding him in contempt has not been vacated and remains in force, and [Paul] has failed to attempt to purge himself of contempt." Lynn argues, therefore, that the appeal is not warranted by existing law or a good-faith argument for the extension, modification, or reversal of the current law. Pursuant to Supreme Court Rule 375 (155 Ill. 2d R. 375), Lynn has filed a motion for attorney fees and costs incurred during the appeal, and we have already denied the motion. For the following reasons, we also deny Lynn's motion to dismiss the appeal.

In its February 5, 1999, order, the trial court found Paul in civil contempt of court, but Paul appealed before sanctions were imposed. On appeal, we concluded that we lacked jurisdiction to consider the contempt finding because no sanction had been imposed. *Thomas*, slip order at 34-35. On remand, the trial court did not modify the February 5, 1999, order or impose sanctions pursuant to it. Moreover, in its January 16, 2002, order, the court ruled that "all rules to show cause and writs of attachment against [Paul] are quashed." The record does not contain any subsequent order finding Paul in contempt of court, and Lynn has identified none. Lynn's assertion that a current contempt finding requires the dismissal of this appeal is based entirely on an inaccurate factual statement. Accordingly, we admonish counsel for misrepresenting the facts, and we deny the motion to dismiss.

### 2. Exclusion of Evidence and Calculation of Arrearage

We now turn to the merits of the appeal. Paul argues that the trial court erroneously excluded the SSA abstract of his 1984 income as a sanction for failing to comply with Lynn's request to appear under Rule 237(b). Paul contends that the judgment must be reversed because the trial court's method of calculating the arrearage was inconsistent with this court's mandate and opinion issued in the first appeal. Paul insists that the trial court lacked any discretion to use evidence of his 1989 income in calculating the arrearage and that the court's calculations are subject to *de novo* review.

■ The mandate of an appellate court is its judgment, which, upon transmittal to the trial court, vests the trial court with authority to take action only that conforms with the mandate. A trial court has no authority to act beyond the scope of the mandate and must follow the specific directions of the appellate court's mandate to the letter to insure that its order or decree is in accord with the decision of the appellate court. *In re Marriage of Ludwinski*, 329 Ill. App. 3d 1149, 1152 (2002). Where a reviewing court remands a case with general instructions, the trial court is required to examine the appellate court's opinion and exercise its discretion in determining what further

proceedings would be consistent with the opinion on remand. *Ludwinski*, 329 Ill. App. 3d at 1152-53. Moreover, if the mandate directs the trial court to proceed in conformity with the opinion issued, the appellate court's opinion must be consulted in determining the appropriate course of action. *Ludwinski*, 329 Ill. App. 3d at 1153.

Here, we issued a general mandate remanding the cause and directing the trial court to proceed in accordance with our unpublished order. The order directed the trial court to make findings regarding Paul's 1984 net income and recalculate any possible arrearage based on the findings. *Thomas*, slip order at 22-23. This court stated that, on remand, the trial court was to afford the parties "an *opportunity* to introduce evidence of Paul's net income as of June 1984." (Emphasis added.) *Thomas*, slip order at 24. Our use of the term "opportunity" gave the trial court discretion in fashioning a procedure for obtaining the relevant information. See generally *In re Marriage of Elliott*, 265 Ill. App. 3d 912, 917 (1994) (our courts have the inherent power to manage their own dockets so as to achieve the orderly and expeditious disposition of cases). Therefore, we next consider whether the trial court abused that discretion.

■ To facilitate the discovery of Paul's 1984 net income, Lynn served Paul with a notice to appear pursuant to Rule 237(b). Rule 237(b) provides as follows:

"The appearance at the trial of a party or a person who at the time of trial is an officer, director, or employee of a party may be required by serving the party with a notice designating the person who is required to appear. The notice also may require the production at the trial of the originals of those documents or tangible things previously produced during discovery. If the party or person is a nonresident of the county, the court may order any terms and conditions in connection with his or her appearance at the trial that are just, including payment of his or her reasonable expenses. Upon a failure to comply with the notice, the court may enter any order that is just, including any order provided for in Rule 219(c) that may be appropriate." 166 Ill. 2d R. 237(b).

■ Lynn served Paul with notice to appear under Rule 237(b), but she did not utilize any other method of discovery, such as written interrogatories, depositions, requests for document production, or requests to admit. These discovery alternatives would have been at least as effective as a personal appearance at trial and much less burdensome for Paul. After reviewing these undisputed facts, we conclude that Lynn's Rule 237(b) notice to appear was merely part of a "fishing expedition" designed to harass Paul and increase his litigation expenses rather than to produce useful information efficiently and effectively.

We remanded the cause for a determination of Paul's 1984 net income, and we recognize that the SSA abstract did not specify whether the $37,800 amount listed therein represented Paul's total income or net income during that period. If the parties had undertaken more thorough discovery, that question and others regarding the accuracy of the abstract could have been answered. If the abstract is, in fact, the most reliable evidence of Paul's 1984 net income, the parties may stipulate to its accuracy. In any event, we conclude that the trial court abused its discretion in excluding relevant evidence, the discovery of which was a purpose of the remand from this court.

We note that, if no reliable evidence of Paul's 1984 net income had been available on remand, the trial court would not have abused its discretion in basing the calculations on Paul's net income from the next closest year for which evidence was available. The court should have used evidence of Paul's 1989 net income, which had already been admitted during prior proceedings, only if more thorough discovery did not disclose Paul's net income during any one year from 1984 through 1988. In any event, under the facts of this case, the trial court should not have summarily excluded the certified SSA abstract when Paul presented it. On remand, we encourage the parties to utilize all of the appropriate discovery tools to obtain and present the most accurate available evidence of Paul's 1984 net income. The trial court should then render findings on the issue and calculate Paul's support obligation and arrearage based on those findings.

### 3. Award of Attorney Fees

■ Paul next contends that the trial court erroneously and arbitrarily awarded Lynn $75,000 in attorney fees and costs for the postdecree litigation. We disagree. The appellate court uses a deferential standard of reviewing the award or denial of attorney fees and costs. A trial court has discretion to decide the issue, and the court's decision will not be reversed absent an abuse of that discretion. *In re Marriage of Uehlein*, 265 Ill. App. 3d 1080, 1090 (1994). A party seeking fees and costs bears the burden of presenting sufficient evidence from which the trial court can render a decision as to the reasonableness of the expenses requested. *In re Marriage of Broday*, 256 Ill. App. 3d 699, 706 (1993).

■ Some of the trial court's comments imply that it was awarding Lynn her expenses in part because Paul had not appeared at trial, but the court further stated that the award was appropriate in light of Paul's failure to pay support as ordered. Lynn's counsel submitted an amended petition for $107,173.30, which itemized the attorney fees and costs, and the court considered evidence in the record of Paul's

ability to pay. On cross-examination of Lynn's counsel, Paul's counsel elicited testimony tending to show that the petition could have been more detailed. After considering argument, the court awarded Lynn $75,000, and under these facts, we conclude that the trial court did not abuse its discretion in doing so.

### 4. QDROs Liquidating the Retirement Accounts

Finally, Paul argues that the trial court erroneously entered QDROs transferring his pension and retirement accounts to Lynn to insure that she would collect the arrearage and attorney fees and costs. Because we reverse the portion of the judgment setting the amount of the arrearage, we also reverse the trial court's entry of the QDROs. However, because the issue is likely to arise on remand, we decide whether the trial court may use QDROs to assign Paul's pension benefits and retirement accounts to Lynn in payment of a judgment.

On February 21, 2002, the court entered QDROs granting Lynn a lump-sum payment of $317,753.22 from *each* of Paul's 401(k) plan in Oracle and his Vanguard Group IRA. Another QDRO granted Lynn monthly disbursements of $3,062, the amount of the prospective support obligation, from Paul's "American National Can Combined Pension Plan 034." The court later amended the American Can QDRO to grant Lynn "100% of the vested pension benefits as accrued through [April 15, 2002]." At the time the QDROs were entered, the aggregate value of Paul's accounts was less than the judgment to which they were directed. It appears that the trial court intended to use the QDROs to assign Paul's pension benefits and retirement accounts completely to Lynn.

■ In deciding the issue, we must review the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 *et seq.* (2000)), as it relates to the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2000)). Pension trust benefits earned by an employee spouse while married are "property" acquired during the marriage pursuant to section 503 of the Marriage Act (750 ILCS 5/503 (West 2000)) and are, thus, marital property subject to division between the spouses upon dissolution of their marriage. *Robson v. Electrical Contractors Ass'n Local 134 IBEW Joint Pension Trust*, 312 Ill. App. 3d 374, 380 (2000).

■ Under ERISA, a method for dividing pension and retirement benefits between the employee spouse and the nonemployee spouse pursuant to a dissolution of marriage is through the mechanism of a qualified domestic relations order (QDRO) approved by the court. 29 U.S.C. § 1056(d)(3)(B) (2000); see generally *In re Marriage of Norfleet,*

243 Ill. App. 3d 925, 928-30 (1993). Pursuant to section 1132(e)(1) of ERISA, state and federal courts have concurrent subject matter jurisdiction to construe the ERISA provisions relating to a QDRO. 29 U.S.C. § 1132(e)(1) (2000). A court must enforce the statute as enacted. *Robson*, 312 Ill. App. 3d at 380.

■ Section 1056(d)(1) of ERISA states that "each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1) (2000). ERISA also contains a preemption provision stating that ERISA "shall supercede any and all state laws insofar as they may now or hereafter relate to any employment benefit plan." 29 U.S.C. § 1144(a) (2000).

After the enactment of ERISA, federal courts were divided on the question of whether spouses, former spouses, and children could claim an interest in pension benefits to satisfy family support obligations. Compare *American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118 (2d Cir. 1979) (holding that a garnishment order used to satisfy court-ordered support payments is impliedly excepted from the ERISA preemption and anti-alienation provisions), with *Monsanto Co. v. Ford*, 534 F. Supp. 51 (E.D. Mo. 1981) (holding that a distribution through a marriage dissolution proceeding of a husband's interest in an employee benefit plan that was not in "pay status" violated ERISA's preemption and anti-alienation provisions).

■ Congress then passed the Retirement Equity Act of 1984, Pub: L. No. 98—397, 98 Stat. 1426, in part to ensure that ERISA's preemption and anti-alienation provisions could not be used to block enforcement of court orders providing for child support and maintenance payments by ERISA plan participants. *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 838, 100 L. Ed. 2d 836, 849, 108 S. Ct. 2182, 2190 (1988). Under ERISA, as amended by the Retirement Equity Act, a QDRO is exempt from both the pension plan "anti-alienation" provision (29 U.S.C. § 1056(d)(3)(A) (2000)) and ERISA's general preemption clause (29 U.S.C. § 1144(b)(7) (2000)).

Pursuant to section 1056(d) of ERISA, a court order relating to spousal property rights in an employee spouse's pension is a QDRO if it creates or recognizes an alternate payee's right to receive all or a portion of the benefits payable with respect to a participant under a plan. 29 U.S.C. § 1056(d)(3)(B)(i)(I) (2000); *Robson*, 312 Ill. App. 3d at 380-81. The QDRO mechanism provides that the alternate payee, or the "spouse, former spouse, child, or other dependent of a participant," is to be considered a plan beneficiary. 29 U.S.C. §§ 1056(d)(3)(K), (d)(3)(J) (2000).

■ Although the issue appears to be one of first impression in Illinois, courts in other states have determined that ERISA authorizes

the entry of court orders assigning pension and other retirement benefits to a former spouse to satisfy support arrearages. See *In re Marriage of Rife*, 529 N.W.2d 280 (Iowa 1995) (holding that an order garnishing a retirement plan to satisfy an unpaid alimony order following a divorce was a valid QDRO under ERISA); *Rohrbeck v. Rohrbeck*, 318 Md. 28, 566 A.2d 767 (1989) (holding that a QDRO is available to a former spouse when enforcing a prior judgment of divorce); *Baird v. Baird*, 843 S.W.2d 388 (Mo. App. 1992) (holding that the trial court erred in dismissing a former spouse's application for a QDRO for past-due maintenance and child support); *Taylor v. Taylor*, 44 Ohio St. 3d 61, 541 N.E.2d 55 (1989) (holding that an order withholding pay from a former spouse's monthly pension disbursement to satisfy an alimony arrearage qualified as a QDRO under ERISA); *Stinner v. Stinner*, 520 Pa. 374, 554 A.2d 45 (1989) (holding that ERISA's anti-alienation provision did not invalidate an order garnishing the former husband's ERISA benefits to satisfy an alimony arrearage). In agreement with this quantum of persuasive authority, we hold that ERISA permits a trial court's entry of a QDRO to assign pension and other retirement benefits to a former spouse to satisfy a judgment for past-due maintenance and child support payments.

Paul argues that section 12—1006 of the Code of Civil Procedure (735 ILCS 5/12—1006 (West 2000)) precludes the court from assigning the pension and retirement benefits to Lynn. We disagree. Section 12—1006(a) provides in relevant part that "[a] debtor's interest in or right, whether vested or not, to the assets held in or to receive pensions, annuities, benefits, distributions, refunds of contributions, or other payments under a retirement plan is exempt from judgment, attachment, execution, distress for rent, and seizure for the satisfaction of debts if the plan *** is intended in good faith to qualify as a retirement plan under applicable provisions of the Internal Revenue Code of 1986, as now or hereafter amended." 735 ILCS 5/12—1006(a) (West 2000).

Section 12—1006 protects a debtor's interest in the proceeds traceable to pension plan payments and a debtor's right to receive benefits, distributions, refunds of distributions, or other payments under a retirement plan. *Auto Owners Insurance v. Berkshire*, 225 Ill. App. 3d 695, 698 (1992). However, our supreme court has held that it is "beyond dispute" that retirement benefits are marital property to the extent that the beneficial interest was acquired during the marriage. *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 303 (2000). In fact, section 503(b)(2) of the Marriage Act acknowledges as much. 750 ILCS 5/503(b)(2) (West 2000). Therefore, when a former spouse seeks the assignment of the plan participant's retirement ac-

counts after obtaining a judgment for a maintenance and child support arrearage, the spouse is not a typical creditor as that term is used in section 12—1006.

Society places a higher value on the timely payment of maintenance and child support than on the future receipt of pension benefits. The Retirement Equity Act illustrates this policy by authorizing the assignment of pension benefits for the payment of family support obligations. Therefore, we conclude that section 12—1006 does not preclude the trial court from entering a QDRO on remand to assign Paul's retirement and pension benefits to Lynn to satisfy a potential judgment. However, the value of the assignment should not exceed the value of the retirement accounts at the time of the marriage dissolution because only that "beneficial interest was acquired during the marriage." *Smithberg*, 192 Ill. 2d at 303. Therefore, Lynn is not entitled to any portion of a fund that did not exist at the time of the dissolution.

If we were to adopt Paul's argument, a trial court would forfeit the option of entering a QDRO to assign pension and other retirement benefits if the court did not do so at the time of the marriage dissolution. We conclude that such a result would frustrate the purpose of the Retirement Equity Act and ERISA.

In a related argument, Paul contends that the original marital settlement agreement precludes the use of QDROs in this case. We disagree. When the marriage was dissolved in 1981, the agreement provided that Lynn waived any right to her share of Paul's pension and profit-sharing fund acquired while he was employed at the American Can Company. The agreement provided that "said fund shall be the exclusive property of [Paul] hereafter free and clear of any interest [Lynn] may have in same." Paul began working for the Oracle corporation sometime after the dissolution.

When construing the meaning of a contract, a court must examine the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning. Furthermore, the court must place the meanings of words within the context of the contract as a whole. A contract term is ambiguous when its terms may reasonably be interpreted in more than one way. The mere fact that the parties disagree on some term, however, does not render the term ambiguous. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990).

The plain language of the settlement agreement's waiver provision reveals that Lynn intended to waive her right to Paul's pen-

sion and profit-sharing fund only as part of the initial distribution of the marital property. Once the trial court determined that Paul had not performed his support obligation pursuant to the same settlement agreement, the court was free to enter the QDROs to insure the equitable distribution of the retirement accounts. The Marriage Act's provision authorizing the filing of a petition to modify a support obligation (750 ILCS 5/510 (West 2000)) evidences the legislature's intent to allow a court to adjust a marital settlement agreement in such a way.

■ Paul finally argues that, even if a court may enter a QDRO under these facts, Lynn may not receive an assignment greater than the amount Paul actually receives in a disbursement from the accounts. Paul contends that, because he has never received a disbursement, Lynn is not entitled to any assignment. We disagree. As noted, under section 1056(d) of ERISA, a valid QDRO creates or recognizes an alternate payee's right to receive *"all or a portion"* of the benefits payable with respect to a participant under a plan. (Emphasis added.) 29 U.S.C. § 1056(d)(3)(B)(i)(I) (2000); *Robson*, 312 Ill. App. 3d at 380-81. Paul cites nothing in the statute that requires the showing of an actual disbursement before an assignment may be effected. Unless the QDRO provides otherwise, Lynn's assignment is independent of Paul's past or future disbursements.

■ On remand, the trial court will likely find an arrearage and might elect to utilize one or more QDROs to transfer Paul's pension and retirement benefits to Lynn in payment of the judgment. ERISA requires that a QDRO be drafted to include very specific information with explicit instructions to the plan administrator. See, *e.g.*, 29 U.S.C. §§ 1056(d)(3)(C) through (d)(3)(E) (2000). The order must specify: (1) the name and last known mailing address of the participant and each alternate payee covered by the order; (2) the amount or percentage of the participant's benefit to be paid by the plan or the manner in which such amount or percentage is to be determined; (3) the number of payments or the period to which the order applies; and (4) each plan to which the order applies. 29 U.S.C. §§ 1056(d)(3)(C) through (d)(3)(E) (2000); see *Robson*, 312 Ill. App. 3d at 381 n.2. The trial court must fulfill these requirements if it chooses to enter a QDRO on remand.

For these reasons, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part, and the cause is remanded with directions.

Affirmed in part and reversed in part; cause remanded with directions.

BOWMAN and KAPALA, JJ., concur.