IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 42875

LINDA C. KESTING,                )
                                 )
    Plaintiff-Appellant,         )    **Boise, February 2016 Term**
                                 )
v.                               )    **2016 Opinion No. 35**
                                 )
JAMES A. KESTING,                )    **Filed: March 23, 2016**
                                 )
    Defendant-Respondent.        )    **Stephen W. Kenyon, Clerk**
_____  )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Patricia G. Young, Magistrate Judge. Hon. Gerald F. Schroeder, Senior District Judge.

The decision of the district court is reversed.

Cosho Humphrey LLP, Boise, for appellant. Matthew B. Schelstrate argued.

Arkoosh Law Offices, PLLC, Boise, for respondent. Nikeela R. Black argued.

_____

J. JONES, Chief Justice

Appellant, Linda Kesting ("Linda"), obtained a judgment against Respondent, James Kesting ("James"), for breach of an alimony/spousal support agreement entered into during their divorce. When that judgment was returned without recovery, the magistrate judge issued a Judgment of Qualified Domestic Relations Order ("QDRO"). The subsequent judgment was intended to allow recovery of the unpaid spousal support and associated attorney fees from James' pension plan. James appealed to the district court, which reversed. The district court concluded that the QDRO was not valid because the spousal support agreement was not merged into the divorce decree and, therefore, the QDRO was not issued pursuant to the State's domestic relations law as required under the Employee Retirement Income Security Act ("ERISA"). Linda timely appealed.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Linda filed suit alleging that James breached a spousal support agreement entered into by the parties during their divorce. The support agreement was a separate agreement not merged into their divorce decree or approved by the court in that proceeding. The agreement in question dealt only with James' obligation to pay alimony to Linda. The agreement is titled "Alimony/Spousal Support Agreement" and makes repeated reference to "alimony/spousal support." James admitted that he had not paid Linda support he owed under the agreement, and the magistrate court entered judgment awarding Linda $8,000 in delinquent support and $1,227.80 in attorney fees and costs. Linda obtained a writ of execution, which was returned unsatisfied. Linda then obtained a QDRO from the magistrate which provided that the judgment for unpaid spousal support and associated attorney fees be satisfied out of James' Terteling Employees Profit Sharing and Thrift Savings Plan 401(k). The QDRO was thereafter approved by the administrator of James' 401(k).

James appealed to the district court, alleging that the magistrate court erred in issuing the QDRO because the QDRO was not issued pursuant to Idaho's domestic relations law as required under ERISA. Both parties also sought an award of attorney fees. The district court agreed with James and issued an opinion reversing the QDRO. Neither party was awarded fees. Linda timely appealed.

# II.
## ISSUES ON APPEAL

1. Whether the district court erred in reversing the QDRO.
2. Whether the district court erred in denying James' request for attorney fees under Idaho Code section 12-121.
3. Whether either party is entitled to attorney fees on appeal.

# III.
## STANDARD OF REVIEW

"When this Court reviews a decision rendered by a district court acting in its appellate capacity, it considers the decision of the district court. This Court exercises free review of the legal issues analyzed by the district court acting in its appellate capacity." *Baruch v. Clark*, 154 Idaho 732, 736, 302 P.3d 357, 361 (2013) (citations omitted). Whether the magistrate court's judgment constitutes a valid QDRO under ERISA is a question of law for this court to review de novo. *See Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1150 n.5 (9th Cir.

2

2000). The Court reviews a district court's decision of whether to award attorney fees under Idaho Code section 12-121 for abuse of discretion. *Burns v. Baldwin*, 138 Idaho 480, 486, 65 P.3d 502, 508 (2003).

## IV.
## ANALYSIS

### 1. The district court erred in reversing the QDRO.

ERISA prohibits the alienation or assignment of pension plan benefits. 29 U.S.C. § 1056(d)(1). "This so-called 'spendthrift' provision of ERISA was intended to 'protect an employee from his own financial improvidence in dealings with third parties.'" *Hawkins v. C.I.R.*, 86 F.3d 982, 988 (10th Cir. 1996) (quoting *Am. Tel. & Tel. Co. v. Merry*, 592 F.2d 118, 124 (2d Cir. 1979)). A divergence of opinion emerged among courts as to whether ERISA's anti-assignment provisions prevented states from attaching pension benefits to enforce family support obligations. S. REP. NO. 98-575 at 18–19 (1984). This divergence prompted Congress to amend ERISA by enacting the Retirement Equity Act ("REA") in 1984, creating an exception to ERISA's anti-assignment provision for QDROs. *Id.*; 29 U.S.C. § 1056(d)(3)(A). The Ninth Circuit has found that "[t]he QDRO exception was specifically enacted to protect the financial security of ex-spouses." *Stewart*, 207 F.3d at 1149.

Under ERISA, a "domestic relations order" means "any judgment, decree, or order (including approval of a property settlement agreement)" that "(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and (II) is made pursuant to a State domestic relations law (including a community property law)." 29 U.S.C. § 1056(d)(3)(B)(ii). To be "qualified," the domestic relations order must "create[] or recognize[] the existence of an alternate payee's right to, or assign[] to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan" and must meet specific form requirements. 29 U.S.C. § 1056(d)(3)(B)(i). James did not challenge the QDRO in this case on the basis that it was not "qualified" under ERISA. Rather, James contends that the QDRO was not valid because there was no court order awarding alimony. Additionally, James argues that the QDRO was not made pursuant to Idaho's "domestic relations law" because, in Idaho, a non-merged spousal support agreement is only enforceable under contract law.

Both parties agree that while a QDRO is usually used to divide a retirement plan upon divorce, a QDRO may be used enforce a judgment to collect delinquent support payments. We

have not previously addressed this issue, but we agree with other courts that have concluded that a QDRO may be entered to enforce a prior support obligation. *See Stinner v. Stinner*, 554 A.2d 45, 48 (Pa. 1989) (holding that a QDRO may be entered to enforce a judgment for breach of an alimony agreement); *Rohrbeck v. Rohrbeck*, 566 A.2d 767, 774 (Md. 1989) (expressly recognizing the ability of a party entitled to a QDRO to obtain one to enforce a previously entered judgment); *In re Marriage of Thomas*, 789 N.E.2d 821, 831 (Ill. App. Ct. 2003) ("[W]e hold that ERISA permits a trial court's entry of a QDRO to assign pension and other retirement benefits to a former spouse to satisfy a judgment for past-due maintenance and child support payments."); *Hogle v. Hogle*, 732 N.E.2d 1278, 1281 (Ind. Ct. App. 2000) ("It is well-established that, under certain circumstances, a pension may be attached or garnished as a means of satisfying a support arrearage."); *Baird v. Baird*, 843 S.W.2d 388, 392 (Mo. Ct. App. 1992) ("ERISA permits QDRO's to be used to enforce an earlier entered support judgment and collect delinquent maintenance and child support payments against a pension fund.").

James contends that the QDRO in this case is not an order that relates to the provision of alimony because there was no court order awarding alimony or approving the spousal support agreement. However, ERISA provides that a domestic relations order may be any judgment, order, or decree that relates to the provision of support, including alimony. 29 U.S.C. § 1056(d)(3)(B)(ii). That requirement is met in this case. Although the support agreement was not incorporated into the divorce decree, Linda brought an action for breach of that agreement and obtained a judgment against James for unpaid support. It is uncontested that the judgment for breach of contract related solely to the provision of spousal support. The QDRO was, therefore, issued to enforce a judgment related to the provision of alimony. The closer question in this case is whether the QDRO was made pursuant to a state domestic relations law.

Here, the district court held that the QDRO was not issued pursuant to Idaho domestic relations law because, in Idaho, non-merged spousal support agreements are governed by contract law. Linda contends that the district court's strict interpretation of "domestic relations law" to exclude enforcement of a support agreement is not in keeping with the purpose behind the QDRO exception—to protect the financial interests of former spouses.

Linda argues that this Court should follow the reasoning in *Stinner*, where the Pennsylvania Supreme Court held that a QDRO issued to enforce an alimony agreement was made pursuant to domestic relations law. 554 A.2d at 47–48. In *Stinner*, The Pennsylvania

4

Supreme Court reversed the superior court's holding that the QDRO was not issued pursuant to domestic relations law because the support agreement was only enforceable under contract law. *Id.* at 48–49. The Pennsylvania Supreme Court reasoned that:

> In holding that Mrs. Stinner's right to alimony was based solely on contract and not on the domestic relations law of this Commonwealth, the Superior Court took a myopic view of the word law. According to *Black's Law Dictionary,* law is derived either from judicial precedents, from legislation or from custom. The custom in Pennsylvania before June 30, 1980, was that it was common to induce spouses to forego divorce contests by entering into support agreements. Moreover, section 514(c) of ERISA, as amended by the Retirement Equity Act of 1984, defines the term "State law" to include "all laws, *decisions,* rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1) (1982 & Supp. III 1985) (emphasis added). Prior to June 30, 1980, although there was no statutory right to alimony after divorce . . . alimony by separation agreement, even though made in contemplation of divorce, was valid, legal, and enforceable.

*Id.* at 48 (footnotes and case citations omitted).

Linda asks this Court to hold that the QDRO was issued pursuant to Idaho's domestic relations law because, like Pennsylvania, Idaho has a history of recognizing and enforcing spousal support agreements. As we stated in *Miller v. Miller,* "[i]t is well settled in this state that support and property settlement agreements are recognized without the award for support having been made by the court." 88 Idaho 57, 63, 396 P.2d 476, 479 (1964).

Additionally, Linda contends that the QDRO was issued pursuant to Idaho's domestic relations law because Idaho allows a former spouse to attach normally exempt property to enforce a claim for alimony. Idaho Code section 11-607(1)(a) provides that a creditor may levy against exempt property to enforce a claim for "alimony, support or maintenance." This provision does not distinguish between court-ordered support and support provided for by an agreement where the obligation is reduced to a judgment. Additionally, Idaho Code section 11-604A(3) provides that a person's right to an employee benefit plan, including a pension, is generally "exempt from execution, attachment, garnishment, seizure, or other levy by or under any legal process whatever." However, the same section also provides that:

> This subsection shall permit benefits under any such plan or arrangement to be payable to a spouse, former spouse, child, or other dependent of a participant in the plan to the extent expressly provided for in a qualified domestic relations order that meets the requirements for those orders under the plan, or, in the case of benefits payable under a plan described in sections 403(b), 408, 408A or 457 of the Internal Revenue Code of 1986, as amended, or section 409 of the Internal

5

Revenue Code as in effect before January 1, 1984, to the extent provided in any order issued by a court of competent jurisdiction that provides for maintenance or support.

I.C. § 11-604A(3).

James argues that Idaho Code section 11-604A(3) only allows a former spouse to enforce a claim for support against a pension plan where support was provided for in a court order. However, a plain reading of the section shows that this requirement only applies to "benefits payable under a plan described in sections 403(b), 408, 408A or 457 of the Internal Revenue Code." I.C. § 11-604A(3). None of these provisions apply to James' 401(k). Except for the above exceptions, Idaho Code section 11-604A does not make a distinction between an alimony obligation created by court order or by agreement, but only requires that the payment from the plan be provided for in a QDRO and meet the requirements for those orders under the plan. Here, those requirements are met as the magistrate court issued a QDRO and the QDRO was approved by the administrator of James' pension plan.

We conclude that the provisions of Title 11 of the Idaho Code that provide for attachment of exempt property to enforce claims for support are part of Idaho's domestic relations law. A plain reading of these statutes shows that the Legislature intended normally exempt property to be subject to execution to enforce an obligation for spousal support, whether created by court order or separate agreement. Title 11's treatment of claims for alimony is in line with the long-standing practice in Idaho of recognizing and enforcing alimony and spousal support agreements.

We disagree with the district court's narrow view of domestic relations law. The district court concluded that a QDRO issued to enforce a judgment for breach of a spousal support agreement is not issued according to Idaho's domestic relations law because (1) the right to enforce such an agreement rests in contract and (2) Idaho law provides no absolute right to spousal support. It is true that Idaho courts have recognized that "[w]hen a spousal support obligation arises only from a settlement agreement, the right to enforce the spousal support obligation rests in contract." *Davidson v. Soelberg*, 154 Idaho 227, 230, 296 P.3d 433, 436 (Ct. App. 2013). Unlike a settlement agreement merged into a divorce decree, a non-merged spousal support agreement is not judicially modifiable. *Id.* Additionally, as the district court pointed out, when spousal support is ordered or approved by a court, the court must consider the factors

6

provided in Idaho Code section 32-705.[1]  Here, where the support obligation was provided for in a separate agreement, there was no judicial consideration of the section 32-705 factors.[2]  While we agree that there are legal differences between an alimony obligation created by court order and one created by agreement, we do not believe those differences remove a judgment to enforce an alimony agreement from the purview of Idaho's domestic relations law.

Here, James voluntarily entered into an agreement to provide spousal support to Linda. It is uncontested that James failed to meet that obligation. Linda obtained a judgment for breach of the support agreement and obtained a writ of execution to enforce that judgment, which was returned unsatisfied. Only after Linda attempted and failed to enforce the judgment did she seek a QDRO to allow her to collect from James' 401(k). It seems likely that without a QDRO Linda might not be able to collect support owed by James.

The policies underlying ERISA's anti-assignment provisions would not be furthered by allowing a person to avoid his or her support obligation because that obligation was agreed to between the parties. ERISA's anti-assignment provisions were not intended to be a barrier to recovery of alimony. H.R. REP. NO. 98-655(1) at 39. In enacting ERISA, Congress was not only concerned about workers but "was also concerned about the families of those workers who

---

[1] Idaho Code section 32-705 provides:

> 1. Where a divorce is decreed, the court may grant a maintenance order if it finds that the spouse seeking maintenance:
>> (a) Lacks sufficient property to provide for his or her reasonable needs; and
>> (b) Is unable to support himself or herself through employment.
> 2. The maintenance order shall be in such amounts and for such periods of time that the court deems just, after considering all relevant factors which may include:
>> (a) The financial resources of the spouse seeking maintenance, including the marital property apportioned to said spouse, and said spouse's ability to meet his or her needs independently;
>> (b) The time necessary to acquire sufficient education and training to enable the spouse seeking maintenance to find employment;
>> (c) The duration of the marriage;
>> (d) The age and the physical and emotional condition of the spouse seeking maintenance;
>> (e) The ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance;
>> (f) The tax consequences to each spouse;
>> (g) The fault of either party.

[2] Both parties were represented by counsel during the divorce proceedings, including the negotiation of the alimony agreement. Competent counsel would likely have based their negotiations on the factors set forth in section 32-705, knowing that the court would obviously consider those factors in the event they were unable to reach a compromise agreement. It is obvious the parties also considered factors not included in section 32-705, such as the provision prohibiting court modification of support payments and a longer duration for support than contemplated by section 32-705. The parties were free to do so.

depend to the same degree on the actual availability of those benefits." *Stone v. Stone*, 450 F. Supp. 919, 926 (N.D. Cal. 1978) *aff'd*, 632 F.2d 740 (9th Cir. 1980). "It would be ironic indeed if a provision designed in part to ensure that an employee spouse would be able to meet his obligations to family after retirement were interpreted to permit him to evade them with impunity after divorce." *Id*. As the Second Circuit aptly stated:

> the usual purpose of exemptions [from garnishment, attachment, and execution] is to relieve the person exempted from the pressure of claims hostile to his dependents' essential needs as well as his own personal ones, not to relieve him of familial obligations and destroy what may be the family's last and only security, short of public relief. . . . The duty is to share, not to desert, when trouble comes . . . The purpose of the proscription on alienation and assignment is to protect an employee from his own financial improvidence in dealings with third parties. The provision is not intended to alter traditional support obligations but rather to assure that the employee and his beneficiaries reap the ultimate benefits due upon retirement.

*Am. Tel. and Tel. Co*, 592 F.2d at 124 (citations and internal quotation marks omitted).

An ex-spouse seeking to enforce a support obligation is not an ordinary creditor. Idaho law specifically recognizes this by allowing a former spouse to collect normally exempt property to enforce a claim for support. I.C. §§ 11-607(1)(a),11-604A(3). Regardless of whether a support obligation was created by court order or provided for by agreement, it was not Congress's intent that ERISA be used as a tool for a person to evade his or her familial support obligations.

We hold that a QDRO is issued pursuant to Idaho's domestic relations law when it is issued to enforce a judgment for breach of a spousal support agreement and complies with Title 11 of the Idaho Code.

### 2. James is not entitled to attorney fees.

Although James prevailed on appeal before the district court, that victory has been erased by this Court. Therefore, James is clearly not entitled to a fee award for proceedings in the district court. In addition, James did not file a cross-appeal on the issue and would not have been able to seek fees on appeal in any event.

### 3. We award Linda attorney fees and costs on appeal.

Linda seeks attorney fees on appeal under the parties' spousal support agreement. James seeks attorney fees under Idaho Code sections 12-117, 12-121 and 12-123. James has not prevailed on appeal and is not entitled to a fee award on any basis.

8

Idaho Rule of Civil Procedure 54(e)(1) provides that, "[i]n any civil action the court may award reasonable attorney fees . . . to the prevailing party . . . when provided for by any statute or contract." Here the parties' spousal support agreement provides that, "[i]f action is required to enforce any of the provision [sic] of this contract, the prevailing party in that action shall be entitled to an award of all attorney fees and costs." Linda is the prevailing party in this action and is entitled to attorney fees on appeal pursuant to the spousal support agreement.

## V.
## CONCLUSION

We reverse the decision of the district court and award Linda attorney fees and costs on appeal.


Justices EISMANN, BURDICK and HORTON CONCUR.


W. Jones, Justice, dissenting:

I respectfully dissent from the Court's holding that the QDRO issued by the magistrate court was valid.

A QDRO is a form of relief that is only valid when made pursuant to domestic relations law. Here, the magistrate court was presented with a private contract governed by contract law and enforceable through contract remedies. When the parties entered into the contract, it was fully within their power to avail themselves of the protections of domestic relations law. They explicitly chose not to do so. Accordingly, by issuing the QDRO the magistrate court has: (1) completely ignored the obvious intent of the contracting parties; and (2) impermissibly modified the terms of a contract by changing the methods by which it can be enforced without grounds for doing so.

A QDRO is defined as "a domestic relations order **made pursuant to a state domestic relations law.**" 29 U.S.C. § 1506(d)(3)(B)(ii)(II), *Maslen v. Maslen*, 121 Idaho 85, 92 n.7, 822 P.2d 982, 989 n.7 (1991)(emphasis added). A domestic relations order is "any judgment, decree, or order (including approval of a property settlement agreement) which relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, or other dependent of a participant, and is made pursuant to a State domestic relations law (including

9

community property law).” 29 U.S.C. § 1056(d)(3)(B)(ii)-(I)-(II); *Green v. Green*, 899 F.Supp.2d 291, 297-98 (D. N.J. 2012).

When two persons choose to end their marriage there is no legal requirement that they submit to the court issues regarding division of property, temporary support or alimony, or other property matters.[3] Where an agreement can be reached, divorcing parties have the freedom to determine the disposition of their own property through contract. Once a contract has been formed, should the parties so choose, they have the option to present that contract to a court for its approval and/or to “merge” it into the divorce decree. “[W]hen a separation agreement is submitted to a court in connection with a divorce action and it is merged into the decree, all provisions are thereafter enforceable by the court as a part of its decree and may at a later time be modified by the court.” *Phillips v. Phillips*, 93 Idaho 384, 386 (1969). However, where a divorcing party does not choose to submit an agreement to the court, its provisions are not enforceable by the domestic relations court and the right to enforce that agreement rests solely in contract law. *See, e.g., Terteling v. Payne*, 131 Idaho 389, 393–94, 957 P.2d 1387, 1391–92 (1998); *Spencer–Steed v. Spencer*, 115 Idaho 338, 344, 766 P.2d 1219, 1225 (1988); *Roesbery v. Roesbery*, 88 Idaho 514, 521, 401 P.2d 805, 809 (1965); *Kimball v. Kimball*, 83 Idaho 12, 16, 356 P.2d 919, 922 (1960); *Bainbridge v. Bainbridge*, 75 Idaho 13, 23–24, 265 P.2d 662, 669 (1954).

In this case, Linda and James Kesting, two consenting adults, entered into a private contract for the payment of alimony. The contract specifically provided as follows:

1.  PAYMENT OF SPOUSAL SUPPORT/ALIMONY:  Jay shall pay to Linda alimony/spousal support in the amount of $1,400 every two weeks commencing on June 11, 2009 and payable every other Thursday thereafter (i.e. in June 2009 Jay shall pay support of June 11th and June 25th , in July 2009 he will pay support on July 9th and July 23rd and shall continue to pay every other Thursday).

    Provided, however, on the first day of the month after the closing of the sale of the residence located at 1399 North Watson, Eagle, Idaho, the spousal support/alimony payment shall change to the amount of $1,600 paid on the first day of each month.

    Provided, further, the spousal support/alimony payments shall terminate immediately upon the death or remarriage of Linda or the death of Jay.

---

[3] Excepting decisions regarding child support and custody.

2.  <u>MODIFICATION</u>:  Neither party shall have the right to request that any court modify the alimony/spousal support payments.  This shall remain a separate contract and does not constitute a court order.

The language of this private contract makes it exceedingly clear that it was not intended to be submitted to the court for approval or for merger into the divorce decree. Rather, it was to be an entirely "separate contract." The effect of this choice is that the contract was never made part of the divorce under the domestic relations law of the State of Idaho. Instead, it remained a private contract under contract law.

Regardless of Linda and Jame's entry into a contract purposefully left separate from their divorce proceedings, however, the Majority now holds that remedies under domestic relations law are available to enforce contracts outside of domestic relations law. This conclusion has no precedential basis, and appears to have been motivated by a pragmatic desire to aid Linda, as evidenced by the Majority's reasoning that "without a QDRO Linda might not be able to collect the support owed by James."

Given that Linda already has a judgment entered in her favor, she has a wide array of contract remedies at her disposal. She has the option of obtaining liens on James' real and personal property or even garnishing his wages or investment income. However, even if Linda were unable to recover without a QDRO, this Court should not presume that her inability to collect is inequitable. It is important to consider why Linda and James chose not to avail themselves of Idaho's domestic relations law.

Idaho Code section 32-705 provides no absolute right to spousal support; on the contrary, section 33-705 provides that such support can only be ordered when the court determines that certain conditions have been met, which include consideration of:

I.C. § 32-705 ("Maintenance") provides:

1.  Where a divorce is decreed, the court may grant a maintenance order if it finds that the spouse seeking maintenance: (a) lacks sufficient property to provide for his or her reasonable needs; and (b) is unable to support himself or herself through employment.

2.  The maintenance order shall be in such amounts and for such periods of time that the court deems just, after considering all relevant factors which may include:  (a) The financial resources of the spouse seeking maintenance, including marital property apportioned to said spouse, and said spouse's ability to meet his or her needs independently; (b) The time necessary to acquire sufficient education and training to enable the spouse seeking maintenance to find employment; (c) The duration of the

11

marriage; (d) The age and the physical and emotional condition of the spouse seeking maintenance; (e) The ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance; (f) The tax consequences to each spouse; (g) The fault of either party.

Maintenance under Idaho Code section 32-705 may have been available to Linda but it is limited by the language of the statute. Accordingly, instead of seeking maintenance under Idaho Code section 32-705, Linda chose to enter into an agreement outside of the review of the magistrate court, which provided that she would receive monthly payments of $1,600 per month until remarriage or the death of either her or James. Linda obtained a number of benefits from this choice. First, in the present case, there was no assurance that had the matter been submitted to the divorce court Linda would have received any level of alimony, support, or maintenance. By entering into an agreement outside of the means provided by domestic relations law, Linda was able to guarantee lifetime support where she might have received no support at all. Second, the terms of this agreement appear to be so far in Linda's favor as to be unheard of in the vast majority of contested divorces. Courts are loath to grant support payments for life, especially where the recipient is so young. By entering into a separate contract Linda was able to attain lifetime payments with the only limit being remarriage. Third, the terms of the agreement expressly provide that they are not subject to modification by the district court. Where a spousal support provision is merged into a divorce decree it is modifiable by the court where a party can show an unforeseen change in circumstances. *Borley v. Smith,* 149 Idaho 171, 177, 233 P.3d 102, 108 (2010). By opting to eschew merger, Linda ensured that her support would not be reduced or cut off should James become unable to pay.

Clearly then, there are a number of bargained for benefits which Linda was able to assume by entering into the contract as written; however, the agreement was not completely one-sided. In exchange for these relatively extreme concessions, James benefitted by keeping the agreement in contract law, which does not allow for the use of a QDRO—a remedy available only under domestic relations law to enforce a decree of support.

Whether the contract between James and Linda was better for one than the other is irrelevant. The point is that two competent adults, who were represented by experienced and competent attorneys well acquainted with Idaho's domestic relations law, decided to make a contract regarding future alimony, support and maintenance, which they clearly had a right to do, rather than submitting the issue to the court for an uncontrolled and unknown result. That

12

contract was presumably made knowingly and intelligently by the contracting parties. It should now be enforced through the avenues available for contract enforcement. By granting a QDRO, the court has nullified one side of the bargained for agreement. Further, the court effectively modified the contract itself, by changing the methods by which it can be enforced. The magistrate court had no grounds on which it could take such an extreme action.

Under the facts of this case, I cannot agree that the enforcement of the federal law regarding QDRO can or should be used to enforce or modify a private contract. I strongly support the decision of the district judge that the QDRO in this case was erroneously issued to enforce a contract that was not merged into the divorce decree, was not modifiable by the magistrate court, and was not issued pursuant to the domestic relations laws of the State of Idaho.

I would affirm the district court.