# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Radzik*, 2011 IL App (2d) 100374

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF MAGDALENA RADZIK, Petitioner and Counterrespondent-Appellee, v. CHRISTOPHER J. AGRELLA, Respondent and Counterpetitioner-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0374 |
| Filed | August 8, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An interim order requiring respondent to pay petitioner's attorney fees was invalid where petitioner failed to establish respondent's ability to pay the amount awarded, his individual retirement account was exempt from any judgment for interim attorney fees, and the contempt order respondent employed in a good-faith effort to challenge the trial court's order was vacated. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 09-D-113; the Hon. David P. Brodsky, Judge, presiding. |
| Judgment | Reversed in part and vacated in part; cause remanded. |

Counsel on
Appeal

Richard M. Varchetto, of Elmhurst, for appellant.

John A. Coladarci, of Coladarci & Coladarci, of Chicago, for appellee.

Panel

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justices McLaren and Bowman concurred in the judgment and opinion.

**OPINION**

¶ 1      Petitioner, Magdalena Radzik, and respondent, Christopher J. Agrella, are engaged in dissolution proceedings before the trial court. On November 6, 2009, the trial court granted petitioner's petition pursuant to section 501(c-1) of the Illinois Marriage and Dissolution of Marriage Act (Act or Dissolution Act) (750 ILCS 5/501(c-1) (West 2008)) for interim attorney fees. On April 9, 2010, after respondent failed to pay that award, the court entered against respondent a judgment of contempt.

¶ 2      Respondent argues five issues on appeal: (1) the court erred in finding him in contempt; (2) the court abused its discretion in entering the interim fee award; (3) an *ex parte* order that issued a rule to show cause is void for lack of proper notice; (4) the court erred in ordering the liquidation and distribution of respondent's individual retirement account (IRA) to satisfy the interim fee award; and (5) the finding of contempt must be vacated because respondent had no other avenue for challenging the court's November 6, 2009, fee order. For the following reasons, we conclude that: the November 6, 2009, interim fee award constitutes error; the court may not, should a new petition for interim fees be filed on remand, order that any award be paid through liquidation and distribution of respondent's IRA; and the contempt finding must be vacated.

¶ 3                                    I. BACKGROUND

¶ 4                        A. Initial Orders, Payments, and Petition

¶ 5      On January 22, 2009, petitioner filed a petition for dissolution of the parties' marriage. The petition asserts that two children (ages 4 and 19 months) were born of the marriage and that petitioner had a daughter (age 16) from a prior relationship whom respondent had not adopted. Respondent was subsequently granted, apparently through an emergency order of protection, sole care and custody of the three minor children, as well as possession of the marital residence. That custody arrangement did not change during the pendency of these proceedings.

¶ 6      On February 6, 2009, petitioner filed a financial affidavit in compliance with Lake

County's local rules (19th Judicial Cir. Ct. R. 11.02 (eff. Dec. 1, 2006)).[1] She listed her total income as zero or unknown, her total monthly living expenses as $15,409, and her debts as unknown. In addition, that same day, she petitioned for a minimum of $50,000 in interim attorney fees and costs. The petition for interim fees asserted that respondent (age 46), an attorney with his own practice, earned a substantial income and had sole access to the parties' assets and, therefore, was "well able" to pay petitioner's interim fees. In contrast, petitioner (age 36) had always been a stay-at-home mother, was unemployed, and did not have the financial ability to pay reasonable attorney fees. The petition was signed and verified by petitioner and was signed and certified by her attorneys. Attached as exhibits were petitioner's retainer agreement with her attorneys, and the attorneys' affidavits attesting to their respective education, experience, and billing rates.

¶ 7    On April 7, 2009, respondent responded to the petition for interim fees, largely denying petitioner's allegations and asking the court to deny the petition. Respondent certified "under penalties of perjury" that his statements were true and correct.

¶ 8    On April 9, 2009, the appointed representative for the minor children petitioned for $6,534.45 in attorney fees. In her petition, she acknowledged that respondent had, per a January 27, 2009, court order, paid her an initial $750 retainer fee. Further, she acknowledged that respondent had paid her an additional $3,000 in fees.

¶ 9    On April 24, 2009, the court ordered respondent to pay petitioner $230 weekly as temporary maintenance. The court ordered petitioner to seek employment, to keep a job log reflecting her efforts to seek employment at a minimum of three locations weekly, and to fax the job log to respondent's counsel monthly. The court ordered respondent to pay $10,000 to petitioner's counsel as interim attorney fees. Respondent represented to the court that he would refinance the marital residence to pay the interim fee award, and the court subsequently granted respondent an extension of time to pay the fees, to allow time for the refinance loan to be approved.

¶ 10    On May 28, 2009, the court granted the child representative's fee petition. On July 6, 2009, the child representative filed a second petition, seeking $13,183.85 in attorney fees. The petition noted that, on June 25, 2009, respondent paid the representative $6,434.45 as ordered by the court in May.

¶ 11    On July 30, 2009, petitioner filed a second petition for interim attorney fees and an "addendum" to the petition. The second petition essentially reasserted the allegations from the first petition; namely, that respondent earned a "substantial income," had sole access to the parties' assets, and was "well able" to pay petitioner's interim attorney fees, and that

---

[1]Rule 11.02(B) provides that "[a]ny motion regarding financial relief regarding attorney's fees, costs, maintenance, or child support shall be served pursuant to Supreme Court Rule 11 and shall be supported by a *current* Comprehensive Financial Affidavit." (Emphasis added.) 19th Judicial Cir. Ct. R. 11.02(B) (eff. Dec. 1, 2006). Section 11.02(C)(3) provides that, at the hearing, the party requesting financial relief must produce his or her last two pay stubs, last three federal income tax returns, and records of any additional income not reflected in those documents. 19th Judicial Cir. Ct. R. 11.02(C)(3) (eff. Dec. 1, 2006).

petitioner was unemployed and lacked the financial ability to pay reasonable attorney fees. Although the second petition referenced her financial affidavit, the record reflects no financial affidavit attached to the petition. Despite signature and verification sections at the end of the petition, petitioner did not sign or verify the petition. The petition contained a signed attorney certification, stating that, upon reasonable inquiry, the petition was, to the best of counsel's knowledge, well grounded in fact. The addendum purported to incorporate the first petition, and it noted that additional fees were incurred after that petition was filed, that petitioner's outstanding balance for her fees was $49,913.15, and that there existed another $29,677.50 in unbilled time and expenses. The addendum acknowledged that respondent, in compliance with the earlier court order, paid petitioner's counsel $10,000.

¶ 12     On August 24, 2009, respondent responded to petitioner's second petition for interim fees. He denied that he could pay the fees and noted that, despite the court order, petitioner failed to timely fax job logs to his counsel. (Previously, respondent moved for a contempt finding on this basis.) He noted that petitioner failed to supply the court with a current financial affidavit and he asserted that petitioner was voluntarily impoverishing herself so as to request contribution when, in fact, she owned various property and other assets. Respondent argued that, since the inception of the proceedings, he: (1) had borne the sole financial responsibility to care for all three children (including the payment of health insurance premiums, school tuition and fees, and bills for medical care, therapy, and $8,000 in dental care for the eldest child who suffered from a serious liver disease); (2) was responsible for the mortgage and other household expenses; (3) paid petitioner $230 in weekly maintenance, paid her vehicle insurance and expenses, and paid her health insurance at $536 every two months; (4) had paid approximately $10,000 to the current child representative, more than $10,000 to the past and current child representatives, and $10,000 to petitioner's attorneys; and (5) had paid and continues to owe his own attorneys for their fees. He concluded that he "simply lacks any additional funds and cannot afford any further expenditures on behalf of petitioner." Again, respondent certified that his statements were true and correct.

¶ 13     Further, on November 6, 2009, respondent moved to strike the petitions for interim fees and moved for sanctions against petitioner, arguing that, while petitioner represented to the court at prior hearings that she had no money, she had earned "thousands of dollars" selling items on eBay through an online business and she had made various unnecessary purchases (including a "butt enhancer"). Respondent attached to the motion printouts purportedly from petitioner's eBay account, of various items sold or purchased and their sale prices. Respondent argued that petitioner actively defrauded the court and misrepresented her financial status in an effort to require respondent to pay more to her than warranted.


¶ 14                    B. November 6, 2009, Interim Fee Award

¶ 15     On November 6, 2009, the parties appeared before the court on petitioner's petition for interim fees. Petitioner's counsel argued that respondent: earned an adjusted gross income of $103,000 in 2008; made a $27,871 contribution to his 401(k) in April 2009 (it is unclear whether this is the IRA at issue in this appeal); sold stocks for $15,000 in September 2009;

-4-

refinanced a home and withdrew $50,000 from a home equity line of credit; pays private school tuition for the children, pays $1,300 per month in childcare, and bought the eldest child a convertible. Petitioner's counsel asserted that the income petitioner made from eBay reflected her need to sell personal items to increase her cash flow and that the "butt enhancer" was for a Halloween costume. Counsel argued that the court needed to level the playing field because respondent had sole access and control of the marital assets and, despite her efforts to obtain employment, petitioner remained unemployed.

¶ 16    Respondent's counsel argued that petitioner's failure to disclose the eBay income, her failure to comply with the court's order that she submit job logs reflecting job search efforts, and her failure to produce a current financial affidavit reflected that an evidentiary hearing would be appropriate. Respondent explained that the convertible for the eldest child cost $1,500 and that the $50,000 was not taken from a line of credit but, rather, came from a mortgage refinance and was used to pay petitioner's attorney fees and other expenses. Respondent stated that "we would be more than happy to do an evidentiary hearing" and argued, "again, there's no billing statement. There's no affidavit. They just fly in here with these crazy fees, and there's nothing backing it up–zero. It's not in compliance with the requirements." Petitioner's counsel interjected, "Judge, if you look at the end of our fee petition, there are our affidavits, and our petitions are verified."

¶ 17    The court determined that it could "easily make this determination on [the petition for fees] with a nonevidentiary hearing," noting that section 501(c)(1) of the Act requires a hearing that is summary and expeditious. The court stated that it would consider all of the factors in section 501(c)(1) and noted that the proceedings before it were complex and that every issue had been contested. The court asserted that both parties had "pled poor" and that neither party had a great amount of money to be "overlitigating" the case. The court found that petitioner required contribution from respondent to be able to adequately participate in the litigation. The court stated:

> "I don't know exactly what all of the assets are. There's been–we've had a number of different things that have been mentioned. I think it was on the last court date [respondent] mentioned having a $40,000 asset of some sort that he would have been able to–may have been able to liquidate for living expenses, and I'm not–I don't know any of those ***.
>
> ***
>
> The court does not know exactly how much money is in this estate ***, but I think that in the interim the court is going to make an award of interim fees and that I think should be sufficient to keep this litigation going, and that award is going to be $32,000 in interim attorney fees."

Respondent interjected, "[S]o that I'm not held [to] be in contempt of court–I don't have it *** I don't have it." At the conclusion of the hearing, respondent's counsel stated, "And I understand the court did not have an evidentiary hearing. However, for the record, I am putting on the record that [respondent] does not have $32,000 at his access. I just want that on the record."

¶ 18                         C. Respondent's Motion to Reconsider the Interim Fee Award

¶ 19      On December 4, 2009, respondent moved the court to reconsider its order that he pay $32,000 in interim fees. Respondent argued that petitioner failed to establish either her current financial status or respondent's ability to pay her fees. Further, respondent asserted that he could not pay his 2009 income taxes and that he owed his own counsel approximately $10,000. Respondent noted that, despite discovery and document production, petitioner did not produce any documents to support her assertion that respondent could afford to pay the fees.

¶ 20      On December 30, 2009, the court stated that it was denying respondent's motion to reconsider, "without any kind of a hearing on it. I've read it, I'm ruling on the pleadings." The court stated that the $32,000 ordered was "extremely reasonable" in this "hotly contested" litigation, that $32,000 was "well-within" respondent's ability to pay, and that it recalled respondent representing that he had a $40,000 source of income to offer petitioner as a settlement. It suggested that respondent use that, or another source, to pay the award. The court noted that petitioner was being litigated into poverty and that, accordingly, one of its priorities was to level the playing field. It ordered respondent to pay the $32,000 fee award by noon the next day.

¶ 21      Respondent interjected to the court that: the $40,000 it mentioned was in an IRA; he had previously offered only to split that IRA as a settlement of marital property; if he withdrew the money, a 10% penalty and taxes would be imposed; the IRA was a retirement account and not income; and petitioner had not shown that respondent has, nor does he have, any other source of funds. Respondent asserted that he could not follow the court's order, stating, "I do not have the money. I have no access to money such as that. It can't happen. I am living with three kids, and I do pay my stepdaughter's medical bills." Respondent's counsel asserted that he did not have an opportunity to prove respondent's inability to pay, to which the court responded, "both parties had a chance to present whatever they wanted to present at that hearing."

¶ 22                         D. Hearings Regarding First Rule to Show Cause

¶ 23      On January 22, 2010, petitioner petitioned for a rule to show cause, because respondent had not paid the fees. The court issued the rule. That same day, respondent's attorney withdrew. In an appearance before the court, respondent's new counsel represented that respondent's former counsel withdrew because respondent was unable to pay any more attorney fees. He said that he was representing respondent on a *pro bono* basis. Further, he argued that the rule to show cause was based on respondent's violation of an order with which he could not comply. Petitioner's attorneys (whose earlier request to withdraw had been denied) reiterated that they could not afford to continue to represent her. The court, in turn, reiterated that it was "extremely serious about making sure that [petitioner's] attorneys get paid" and that, after a hearing, it had found that respondent was capable of paying, again, based on a former offer of $40,000 to settle the case. The following dialogue ensued:

       "RESPONDENT'S COUNSEL: I think you misinterpreted his offer.

       THE COURT: I did not. I did not. I heard him loudly and clearly.

RESPONDENT'S COUNSEL: He said if he did a pre-disbursement of marital assets.

THE COURT: He has $40,000 in marital assets. There is a place where he could get those attorney's fees.

RESPONDENT'S COUNSEL: And I absolutely agree with you, Judge, accept [*sic*] for one problem. If my client takes $40,000 out of an IRA and gives it to counsel, he will only get $20,000 because they will take a 10 percent penalty, and they will take the income tax out of it. If[,] on the other hand[,] you transfer it, and it can only happen by agreement, *** as part of a disbursement of marital–without prejudice, Judge, to a final finding of disbursement of the assets, if he transfers it to her and she takes it out of the account, she will only pay a minimum of taxes. What we are saying is *** instead of blowing $20,000 in martial assets to the government, we only blow $5,000 of marital assets to the government. It doesn't make any sense for my client to blow 20, I mean it's $20,000 she could get later on."

¶ 24    On February 19, 2010, respondent's former attorney petitioned for fees, alleging that respondent had an outstanding balance due in the amount of $48,682 and requesting a judgment for those fees. Further, the child representative petitioned for and was awarded $13,395 in fees.

¶ 25    On February 24, 2010, the parties appeared on the return of the rule to show cause. According to the common-law record,[2] respondent was ordered to pay, within 72 hours, petitioner and her attorneys $32,000 and the child representative $8,000 from the IRA. The order provided that "[respondent] shall transfer the funds to [petitioner] in her name, and [petitioner] shall deliver the funds" to her attorneys and the child representative immediately thereafter. The hearing on the rule was continued to March 5, 2010.

¶ 26    On March 5, 2010, the court was informed that respondent had liquidated stocks within the IRA and had ordered a transfer of the funds to petitioner for her to pay her counsel and the child representative. However, *petitioner* refused to open an IRA in her name to receive the funds. Petitioner's attorneys represented that they understood that the order was designed to save taxes; if petitioner received the funds and withdrew them from an IRA in her name she would be taxed only 10% to 15% on the withdrawal, whereas a direct withdrawal from respondent's account would result in a 28% to 34% penalty, and *respondent* had agreed to pay the withdrawal penalty that would occur when petitioner withdrew the funds. Nevertheless, petitioner's attorneys were unable to convince her to open an account to receive the funds and, therefore, they requested that tax consequences be viewed as only secondary to the enforcement of the order and that respondent disburse the funds directly to them. Respondent's counsel, in turn, represented that respondent had authorized in excess of $44,000 to be transferred and, therefore, he asked the court to order petitioner to open the IRA, because "the court has an obligation to protect the marital estate. We are talking about throwing away $15,000."

¶ 27    The court ordered respondent to cash out $40,000 from the IRA to directly pay petitioner's attorneys and the child representative. The court reserved the issue as to who

---

[2]The record contains no transcript of this portion of the February 24, 2010, hearing.

would pay the additional income taxes that would result from petitioner's refusal to open the account, warning petitioner that she will probably, ultimately, be "on the hook" for:

> "[T]he $15,000 that you're wasting by refusing to do what it is that everyone is telling you to do, but that's okay. If you don't want to do that, if you want to waste that $15,000, that's going to come from your side of the balance sheet.
>
> ***
>
> I mean it's a simple thing for her to open up the account. He was going to pay the tax liability. Really, there was no downside to it from her, but I understand if she doesn't want to do that, that's fine. If you would rather pay the $15,000, I will let you do that, Ma'am. *** You have a right to do that.
>
> ***
>
> *** [W]e had a procedure laid out to save about $15,000 in tax money. I understand you don't want to do that. You have a right to stop that."

The final order provided, "respondent objects to the liquidation of his IRA account to pay interim attorney fees." Petitioner's counsel's renewed request to withdraw was continued to March 16, 2010.

¶ 28    On March 16, 2010, petitioner's attorneys represented that they remained unable to convince petitioner to open an IRA, so they had asked respondent to pay directly. The next day, however, petitioner had sent them a letter saying that she did, in fact, open the IRA but also that she wanted them to withdraw. In court, respondent's counsel asserted that he was prepared to transfer the funds to petitioner upon verification that the account existed. Petitioner stated that she opened the account, and respondent's counsel stated that he would "be happy to transfer it, Judge, if you'd give me the account number." The court, however, replied, "I'm going to have that transferred directly to [petitioner's counsel and the child representative]." Respondent's counsel asked "why we're going backwards," and the court stated that, in light of the potentially adverse relationship that existed between petitioner and her attorneys, it wanted to ensure that the attorneys received their money. It ordered that respondent should within 24 hours directly pay petitioner's counsel and the child representative from the IRA and that the funds should *not* go through an account in petitioner's name. Further, it granted petitioner's counsel's motion to withdraw.

¶ 29                    E. Hearing on Second Rule to Show Cause

¶ 30    According to the common-law record,[3] three days later, on March 19, 2010, petitioner filed another petition for a rule to show cause, because respondent had not paid counsel in compliance with the court's March 16, 2010, order. In addition, petitioner requested an additional $11,397 in fees. Also that day, the court issued the rule with a return date of April 9, 2010. The rule was issued *ex parte*, with only the child representative, petitioner, and her attorney listed as having been present in open court. No certificate of service is attached to the petition.

---

[3]There is no transcript from this court hearing, if there was one, contained in the record.

¶ 31    On April 9, 2010, the court held a hearing on the rule to show cause. Respondent's counsel argued that neither he nor respondent was served with the rule and that the rule was a void order. Further, respondent's counsel argued that respondent would refuse to pay the money because he was of the opinion that it was legally inappropriate for the court to order him to liquidate the IRA to pay interim attorney fees. The court replied:

> "THE COURT: [I]t was [respondent] who suggested that that was the way that it would get paid, not the court. He offered that up to the court as a method of paying the child–
>
> RESPONDENT'S COUNSEL: There's a big difference between him transferring that money to her and her paying her lawyer.
>
> THE COURT: I don't know how you can complain after putting it in an order when he's the one who suggested it.
>
> RESPONDENT'S COUNSEL: It's not a difference without a distinction. It is a difference with a big distinction, and the distinction is that you can't order him to do it. He can agree to transfer money, marital assets.
>
> ***
>
> He agreed to transfer the money. He didn't agree to liquidate his IRA account to pay attorney's fees. He agreed to transfer the money to [petitioner]. There's a big difference between the two things. He's never agreed nor offered to do the other, okay, and because he offered to transfer the money so that we could 'even the playing field' here, it doesn't mean that the court has the right to order him to pay funds out of an IRA, which I don't think you do.
>
> THE COURT: He agreed to that order.
>
> RESPONDENT'S COUNSEL: No he did not. If you'll see, the order says he agreed to the order to transfer the money.
>
> THE COURT: See, I feel a little set up here. I ordered him to pay ***. He then suggested that this is the method by which we will do it, and I said okay, that's an acceptable method. We put it in an agreed order, and now you're saying I can't order him and that's why it's invalid."

¶ 32    Counsel then represented to the court that he would transfer the *entire* IRA of $80,000 to petitioner, even though he claimed that some of it was nonmarital, in return for: (1) receiving "credit" at trial for having done that; and (2) the lump-sum transfer disposing of the petition for interim fees. Petitioner's counsel objected, partially on the potential tax ramifications that such an "income" would have for petitioner.

¶ 33    The court expressed that "it's over today. That money is going to get paid. We're going to have the hearing today." Thereafter, in opening statements, respondent's counsel reminded the court that, at the hearing at which the $32,000 interim fee award was entered, there was no: (1) presentation of any evidence; (2) financial affidavit as required by local rules; or (3) statement as to which of petitioner's counsel's fees were related to the divorce (as opposed to other proceedings pending involving the parties). Counsel argued that the evidence would show that respondent could not pay the fees from any source other than the IRA; however,

counsel argued, the court could not order respondent to liquidate that asset, and doing so might constitute dissipation of the estate because of money unnecessarily lost to taxes.

¶ 34    In sum, respondent testified that he had one checking account with $195 in it. As of November 1, 2009, respondent possessed three assets: (1) a condominium in Chicago that was in foreclosure, was being offered at $200,000 as a short sale, and that had not sold; (2) his house, burdened with $643,000 secured against it; and (3) the $80,000 IRA. Respondent testified that, after the refinancing in July 2009 (to pay, in part, the initial $10,000 interim fee award), his line of credit had been closed (partly due to the condo foreclosure) and he was not permitted to further borrow against the house. Respondent testified that he could not presently borrow money and that he was a solo practitioner, with his law practice constituting his sole source of income. As of November 1, 2009, his average monthly net pay was $7,500 to $8,000, but he had not been "even close" to paying all of his bills. Specifically, he testified that: (1) he was currently two months behind on his office rent; (2) he was around $13,000 behind on bills related to treating the eldest child's hepatitis and to other expenses, including her psychological counseling; (3) he just paid his $900 gas bill, which he had not paid during the winter; (4) he was seven months behind on his condo mortgage; (5) while he generally paid the children's nanny $300 per week, he had missed a few payments and owed her $600; (6) he paid $350 per month in one child's school tuition; (7) he paid his first attorney $20,000 to $30,000, but owed him $55,000; and (8) he just became current on the home mortgage, which was $3,600 per month. "I'm short every month, short every month." Further, he did not, in 2009, make estimated tax payments for his law practice and he did not have the approximately $20,000 to $25,000 he would owe in taxes for the 2009 tax year. Respondent testified that, since 2009, he had been solely responsible for "every penny" for the three children and their care. Respondent agreed that he bought the eldest child a used car for $1,500 and spent $600 to $800 to fix it. He also paid the insurance for that car, as well as for the car petitioner drove, in an amount totaling around $300 per month. He paid support to petitioner in the amount of $230 weekly, per the court order. Respondent had two credit cards, one he did not use and did not know if there was a balance on. The other had a balance of approximately $4,000. Respondent testified that he did not know the credit limits on the cards.

¶ 35    As to the court's order that he transfer money from the IRA into an IRA in petitioner's name, respondent testified that he took "all the steps [he] could to make that happen up to and including liquidating stocks into cash" on or about January 22, 2010, and contacting a representative from Ameritrade who explained the process and sent the proper forms for the transfer authorization. "I was on the phone for days making it happen." Respondent explained that, when petitioner finally opened up an account, she opened a Roth IRA instead of a traditional IRA and so the transfer of $44,000, "which I fully authorized several times, was stopped cold." Respondent's attorney presented the court with respondent's current financial affidavit, which respondent testified fairly and accurately represented his monthly expenses with the exception that the medical bills had increased. The child representative asked respondent if, other than his belief that he did not have a legal obligation to pay the interim fees out of the IRA, there was any reason that he had not done so, and he replied "No."

¶ 36    The court found respondent in indirect civil contempt for violating the orders entered on November 6, 2009, December 30, 2009, February 24, 2010, March 5, 2010, and March 16, 2010, in that "although he had the ability to pay said attorneys fees he failed to do so." The court stated that the issue of liquidating the IRA was a red herring because "on November 6, 2009[,] this court had a hearing in which [it] found that [respondent] had the ability to pay the attorney's fees in the amount of $32,000" and noted the importance of that in light of the "scorched earth" litigation. The court found "ludicrous" respondent's argument that the court could not order him to pay the fees from the IRA, because it was respondent's "suggestion" to do it that way. Further, the court stated that, if respondent had a desire to pay in accordance with the court's orders, he would have contacted petitioner's attorneys and the child representative to arrange to make payments. "Not one penny had been paid. There has been no good faith attempt to make payments, no effort whatsoever to make payments, there's been no effort to comply with the court's orders." The court sentenced respondent to the custody of the sheriff of Lake County with a purge amount of $40,000; the sentence was stayed until May 21, 2010. Respondent's counsel asked the court to clarify whether it was ordering respondent to take the purge amount out of the IRA, "because there had been uncontroverted testimony he has no money except what's in that account." The court replied, "I disagree. The court has previously found that he has the ability to make those payments." Respondent replied, "Based on what evidence, Judge?"

¶ 37    On April 16, 2010, respondent filed his notice of appeal. On May 14, 2010, the trial court stayed the enforcement of the contempt order during the pendency of this appeal.

¶ 38                                II. ANALYSIS

¶ 39                    A. Statutory Authority for Interim Fees

¶ 40    Section 501(c-1) of the Act permits a trial court, while a case remains pending, to assess attorney fees and costs in favor of the petitioning party's counsel. 750 ILCS 5/501(c-1) (West 2008). The party seeking interim attorney fees is expected to file a petition "supported by one or more affidavits that delineate relevant factors." 750 ILCS 5/501(c-1)(1) (West 2008); *Kaufman, Litwin & Feinstein v. Edgar*, 301 Ill. App. 3d 826, 836 (1998) (noting that section 501(c-1) provides that the fee petition must be supported by one or more affidavits); see also David H. Hopkins, *"Leveling the Playing Field" in Divorce: Questions and Answers About the New Law*, 85 Ill. B.J. 410, 412 (1997) ("A petition for an interim award must be supported by at least one affidavit, ordinarily that of the petitioning litigant. Any petition for an interim award not accompanied by at least one supporting affidavit is susceptible to a motion to strike."). Further, except for good cause shown, proceedings regarding interim fee awards shall be nonevidentiary, summary, and expeditious. *Edgar*, 301 Ill. App. 3d at 836; see also David H. Hopkins, 85 Ill. B.J. at 411 ("interim fee hearings may be non-evidentiary, with a court hearing argument of counsel but otherwise ruling on the pleadings and affidavits"). Although an evidentiary hearing is not required under section 501(c-1), an interim fee award must be supported by "non-testimonial evidence, as submitted by the parties in the form of affidavits, financial disclosure statements, [or] requests for judicial notice." *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 319 (2001); see also *Edgar*, 301 Ill.

App. 3d at 836-37 (reasonable attorney fees may properly be determined by a nonevidentiary proceeding if the trial court can determine from the evidence presented in the petition and response what amount would be a reasonable award and the opposing party has an opportunity to be heard).

¶ 41 Section 501(c-1)(1) provides that, in assessing interim fees, the court shall consider:

"(A) the income and property of each party, including alleged marital property within the sole control of one party and alleged non-marital property within access to a party;

(B) the needs of each party;

(C) the realistic earning capacity of each party;

(D) any impairment to present earning capacity of either party, including age and physical and emotional health;

(E) the standard of living established during the marriage;

(F) the degree of complexity of the issues, including custody, valuation or division (or both) of closely held businesses, and tax planning, as well as reasonable needs for expert investigations or expert witnesses, or both;

(G) each party's access to relevant information;

(H) the amount of the payment or payments made or reasonably expected to be made to the attorney for the other party; and

(I) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/501(c-1)(1)(A) through (c-1)(1)(I) (West 2008).

¶ 42 Upon finding that the party seeking fees lacks "access to assets or income" to pay reasonable amounts *and* that the party from whom fees are sought does have the financial ability to pay reasonable amounts, the court shall assess an interim fee award in "an amount necessary to enable the petitioning party to participate adequately in the litigation." 750 ILCS 5/501(c-1)(3) (West 2008). "In determining an award, the court shall consider whether adequate participation in the litigation requires expenditure of more fees and costs for a party that is not in control of assets or relevant information." *Id*. If the court finds that both parties lack financial ability or access to assets or income, the court shall allocate available funds for each party's counsel in a manner that achieves substantial parity between the parties. *Id*. Before final judgment, a temporary order may be revoked or modified "on a showing by affidavit and upon hearing" and it terminates when the final judgment is entered. 750 ILCS 5/501(d)(2) (West 2008).

¶ 43 Interim fee awards shall be without prejudice to (1) any final allocation; or (2) any claim of right of party or counsel at the time of the award (such claims or rights may be brought under the Act at a contribution hearing or a hearing on counsel's final fees). 750 ILCS 5/501(c-1)(2) (West 2008). An interim fee award is deemed an advance from the parties' marital estate, and any portion of an interim award constituting an overpayment shall be remitted back to the appropriate person or party. *Id*.

¶ 44                              B. November 6, 2009, Interim Fee Order

¶ 45       We note first that a court order awarding interim attorney fees under section 501(c-1) of
the Act is not an appealable interlocutory order. *In re Marriage of Tetzlaff*, 304 Ill. App. 3d
1030, 1039 (1999). However, when a party appeals from a contempt sanction imposed for
violating an interim fee order, the contempt finding is final and appealable and presents to
the reviewing court the propriety of the underlying order. See, *e.g.*, *Reda v. Advocate Health
Care*, 199 Ill. 2d 47, 54 (2002). We review for an abuse of discretion the trial court's
decision to award attorney fees. *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 320 (2001).
Here, we agree with respondent that the trial court abused its discretion in issuing the
November 6, 2009, interim fee award.

¶ 46       In assessing the propriety of the court's order, we find *Beyer* instructive. There, the
husband appealed the propriety of a section 501(c-1) award, arguing that the wife did not
sufficiently establish either his ability to pay the fees or that the fees requested were
reasonable. In assessing the husband's arguments, the appellate court noted the specific
allegations in the wife's petition, her affidavit, and her attorney's affidavit, which together
spoke to the wife's income and expenses, the husband's access to various sources of income
and lines of credit, and the husband's attempts to thwart discovery, which limited her access
to additional information. *Id*. The court therefore rejected the husband's argument that, where
he was in control of the relevant information, the wife should also have attached to her
petition the husband's current pay stubs, bank statements, and financial affidavits to support
her allegations. *Id*. Further, the court found significant that the husband did not file a
counteraffidavit or financial disclosure statement *denying* his ability to pay. *Id*. Finally, the
court noted that, where the trial court was familiar with the case and was in a position to
assess cooperation with discovery and each party's access to relevant information, the court
did not abuse its discretion in granting the interim fee award, "in view of the uncontradicted
representations concerning [the husband's] ability to pay." *Id*. As to the reasonableness of
the fees sought, the court noted that the statute specifically did not require itemized billing
statements, that the wife's attorney had submitted an affidavit representing the amount of
fees incurred and likely to be incurred, that the husband had not previously contested the
reasonableness of the fees, and that the trial judge, who had presided over the case for one
year, had knowledge of the procedural history of the case and was able to rely on his
knowledge when deciding the reasonableness of the fees. *Id*. at 321.

¶ 47       We also find instructive *In re Marriage of Rosenbaum-Golden*, 381 Ill. App. 3d 65, 82
(2008), where the court rejected the respondent's argument that the interim fee award was
error because the petition was unsupported by affidavits and there was no showing that the
petitioner lacked the ability to pay fees. Instead, the court found that the documentary
evidence attached to the verified petition, including both parties' tax returns and the
respondent's financial disclosure statement, supported the trial court's conclusion that the
petitioner lacked sufficient access to assets or income to pay fees. *Id*. at 81. Further, the court
noted that the respondent's assertions that the petitioner could afford to pay were either not
included in his response or were unsubstantiated allegations "instead of testimony or
documentary evidence." *Id*. at 80.

¶ 48       Here, in contrast, the second petition for interim fees (filed July 2009) contained *no*

-13-

*affidavit*, whether from petitioner or her attorneys. As noted above, section 501(c-1) specifically requires that at least one affidavit be attached because, while the proceeding may be nonevidentiary, proof may instead be provided via the required affidavits. 750 ILCS 5/501(c-1) (West 2008). In addition, the local rules required that the petition contain a current financial affidavit and that other updated financial documents be produced at the hearing. 19th Judicial Cir. Ct. R. 11.02 (eff. Dec. 1, 2006). Not only did the second petition violate the Act and local rules where it did not include affidavits, but it also failed to attach any other financial documents, such as those that the courts in *Beyer* and *Rosenbaum-Golden* found supported the judgments they reviewed.

¶ 49    We acknowledge that the addendum to the petition purported to incorporate the first petition, filed five months earlier (although it did not attach that first petition or the February 2009 financial affidavit) and that the first petition for interim fees included petitioner's financial affidavit and affidavits from petitioner's attorneys. However, even if the court considered both petitions and their exhibits together, the evidence to support petitioner's inability to pay and respondent's ability to pay was lacking. The petition alleged only generally that petitioner could not pay and that respondent had a substantial income and was "well able" to pay. As to petitioner's inability to pay, the financial affidavit was clearly outdated and inaccurate. For example, the financial affidavit was filed before petitioner began receiving maintenance and, therefore, did not accurately reflect all sources of income. In addition, and unlike the respondent in *Rosenbaum-Golden*, respondent here provided not just allegations, but evidence, in the form of eBay printouts, reflecting that petitioner's financial affidavit was likely an inaccurate picture of her current financial status. Notably, at the hearing, petitioner's arguments focused on her need to engage in Internet sales, as opposed to the accuracy of the information in the documents. While the eBay sales might not have made petitioner financially solvent to the point of being able to pay her own fees, they certainly were relevant to the accuracy of the information provided to the court so that it could make a well-informed decision of what amount, if any, was a reasonable amount to require respondent to pay.

¶ 50    As to the petition's allegation that respondent was "well-able" to pay, the court heard argument from counsel regarding respondent's 2008 adjusted gross income and money he spent on the children's schooling, childcare, and a used vehicle for the eldest child. It also heard the apparent misrepresentation that respondent withdrew $50,000 from a home equity line of credit. However, both in the response to the petition and at the hearing, questions were raised regarding the extent to which respondent could presently afford to pay, in light of his acting as sole provider for the three minor children, his support obligations to petitioner, his past payments to both counsel and the child representatives, and the fact that he had already refinanced the marital residence to pay a fee award. Unlike in *Beyer*, respondent here explicitly and repeatedly denied his ability to pay the amount the court ordered, and he repeatedly requested (both before and after the award was entered) an evidentiary hearing to so establish. Despite petitioner's argument to the contrary, we do not find that respondent's failure to file a separate, written motion for an evidentiary hearing in any way diminished the request.

¶ 51    The party requesting interim fees has a burden to prove that he or she is entitled to the

relief requested. *Beyer*, 324 Ill. App. 3d at 320 (party requesting fees has the burden to show the other party's ability to pay). On this record, where the trial court had reason to believe that the minimal support provided for the fee request might be inaccurate, petitioner failed to meet that burden. At a minimum, we think that good cause was shown to hold an evidentiary hearing. 750 ILCS 5/501(c-1)(1) (West 2008). We remain mindful that the trial court possessed knowledge of this case and the litigious nature of the proceedings and that a hearing on an interim fee petition is to be expeditious and summary "except for good cause shown." The court's knowledge of the case certainly might have aided its assessment of the theoretical reasonableness of the fees that petitioner requested or its determination that respondent was likely in a superior financial position to petitioner. However, the court abused its discretion in determining that petitioner established respondent's ability to pay, because it received virtually no evidence regarding respondent's present ability to pay the *amount* that the court awarded.[4]

¶ 52        We further note that the court, in announcing its decision, explicitly stated that it did not base its award on any knowledge of respondent's ability to pay. In fact, the court mentioned several times that it did not know the nature or extent of the marital estate or available assets. It recalled that respondent once mentioned that he had at his disposal a "$40,000 asset of some sort," but it did not "know any of those." The court's assumptions that respondent presently held those funds, that respondent could access those funds as opposed to merely transfer them to petitioner, and that the interim award, which was to be an advance against the estate, was appropriate when the court did not, in fact, know the value of the estate or the assets (such that, theoretically, the award could have exceeded the value of the estate and/or assets) constitute an abuse of discretion.

¶ 53        In sum, we conclude that a court's knowledge of the case can stretch only so far. The Act permits nonevidentiary, summary hearings on interim fee petitions, but it does not obviate the need for proof. The Act requires the petitioning party, through the petition, affidavits, and any other relevant documents, to establish both his or her inability to pay *and* the responding party's ability to pay. While the court here might have been able to determine from its knowledge of the case that an interim fee award might be appropriate or that the fees that counsel charged (and, in turn, that petitioner requested) were theoretically reasonable, the record does not reflect that petitioner in any way established respondent's ability to pay the amount that the court, in fact, awarded. Thus, we reverse the November 6, 2009, interim fee award.

---

[4]We note that, generally speaking, while the petitioning party need not be destitute to receive an attorney fee award, the responding party need not be destitute to *avoid* paying the fees; neither party's estate should be exhausted, nor their economic stability undermined. See, *e.g.*, *In re Marriage of Mantei*, 222 Ill. App. 3d 933, 941 (1991); see also *In re Marriage of Krivi*, 283 Ill. App. 3d 772, 783 (1996) (reversing a final judgment ordering the respondent to pay the petitioner's attorney fees where the petitioner's financial circumstances reflected an ability to pay her own attorney fees, even though little money remained after paying her living expenses, and where, although the respondent earned more money than the petitioner, he also had greater expenses and could barely cover his monthly expenses, including child support).

¶ 54                          C. Retirement Accounts for Interim Fees

¶ 55        If, on remand, petitioner files a new petition for interim attorney fees, the question whether respondent's IRA, part of which he concedes contains marital funds, may be ordered liquidated to satisfy an interim fee award will likely recur.[5] Thus, for the sake of judicial efficiency, we consider the issue and answer the question in the negative. Specifically, we conclude that, while IRAs may be ordered liquidated to enforce support judgments, they remain exempt from judgments for interim attorney fees.

¶ 56        Respondent's argument that the trial court could not order him to pay interim attorney fees by liquidating a retirement account is based on section 12-1006 of the Code of Civil Procedure (Code). 735 ILCS 5/12-1006 (West 2008). Section 12-1006 provides that retirement plans, including IRAs, are exempt from judgment, attachment, execution, and seizure for the satisfaction of debts. Case law interpreting the section 12-1006 exemption, as it applies to the Act, holds that the exemption does not apply to *support* arrearages. For example, in *In re Marriage of Murphy*, 338 Ill. App. 3d 1095, 1098 (2003), the court rejected the respondent's argument that certificates of deposit purchased with his pension funds could not, per section 12-1006, be ordered to be transferred to the petitioner to satisfy a child support arrearage. The court noted that section 15(d) of the Income Withholding for Support Act (Support Act) (750 ILCS 28/15(d) (West 2000) (originally codified within the Dissolution Act and which applies to withholding income to secure support ordered under the Dissolution Act (now see 750 ILCS 5/706.1 (West 2008)))) specifically provides that "income" includes periodic payments from retirement sources and that any state laws exempting such income are inapplicable. *Murphy*, 338 Ill. App. 3d at 1098. Emphasizing that it is this state's public policy to ensure that support judgments (defined in the Support Act as orders for temporary or final child support or maintenance) are enforced by all available means, the court held that section 12-1006 of the Code did not apply and that the respondent's retirement benefits were subject to judicial process for the satisfaction of the child support arrearage. *Id*.

---

        [5]We find of no import here the dispute between whether respondent "offered" the IRA funds versus whether the court "ordered" him to disburse them. The only basis the court offered for the amount of the interim fee award it "ordered" was the $40,000 asset, *i.e.*, the IRA. The court "suggested" that respondent pay the award from that or any other source. As respondent allegedly had no other source from which to pay, he made various efforts to comply with the court's order in a manner that would avoid possible dissipation of the marital estate. We do not view these actions as an offer to pay from the IRA so much as an attempt to satisfy the court order in the least wasteful manner. In fact, the record makes clear that respondent never offered to *liquidate* and *cash out* the IRA; he offered to *transfer* funds from the IRA. Further, there was no evidence at the contempt hearing (the only evidentiary hearing touching on respondent's ability to pay) to counter respondent's testimony that the IRA was the only source from which he could conceivably pay the interim fee award. He did not pay as ordered from that source, because he asserted that the court could not impose the obligation to do so. Thus, the question is whether respondent's understanding is correct.

¶ 57        Similarly, in *In re Marriage of Thomas*, 339 Ill. App. 3d 214 (2003), the case upon which petitioner heavily relied to argue that the court could order respondent to pay the fee award from the IRA, the court considered a *support* order. Specifically, in *Thomas*, the trial court awarded the petitioner past-due support and attorney fees. This court considered the question whether the trial court properly allowed the petitioner to recover the support arrearage via qualified domestic relations orders (QDROs).[6] We concluded that a court may enter QDROs to transfer the value of pension and retirement accounts to satisfy a support arrearage but that the assignment must be limited to the value of the accounts at the time of the marriage dissolution. *Id*. at 227. Specifically, we stated, "we hold that ERISA permits a trial court's entry of a QDRO to assign pension and other retirement benefits to a former spouse to satisfy a judgment for *past-due maintenance and child support*." (Emphasis added.) *Id.* In so holding, we rejected the respondent's argument that section 12-1006 of the Code prohibited the assignment, noting that, insofar as a beneficial interest was acquired during the marriage, retirement benefits are marital property and, therefore, "when a former spouse seeks the assignment of the plan participant's retirement accounts after obtaining a judgment for a *maintenance and child support arrearage*, the spouse is not a typical creditor as that term is used in section 12-1006." (Emphasis added.) *Id*. at 227-28. We then proceeded to note the societal import of timely payments of support obligations. *Id*. at 228.

¶ 58        In contrast, there is support for respondent's argument that, while retirement accounts are not exempt under section 12-1006 from judgment for *support* orders, they remain exempt for orders pertaining to attorney fees. For example, in *Jakubik v. Jakubik*, 208 Ill. App. 3d 119 (1991), this court rejected the argument that attorney fees share the section 12-1006 exemption enjoyed by support arrearages. Specifically, in *Jakubik*, the trial court entered a judgment garnishing the defendant's IRA to enforce its award of fees to the plaintiff's attorneys. The trial court rejected the defendant's argument that section 12-1006 exempted IRAs from judgment, holding instead that the strong public policy favoring collection of child support and maintenance obligations created an exception "to the property exemption statute [*i.e.*, section 12-1006] for attorney fees incurred in collection of support obligations." *Id*. at 122. This court reversed. Noting that section 12-1006's exemption does not apply to child support and maintenance obligations, because there are explicit statutory exceptions for those obligations, we held that "attorney fees enjoy no exception to the exemption statutes." *Jakubik*, 208 Ill. App. 3d at 123. This court rejected the plaintiff's attorney's argument that attorney fees generated during a proceeding concerning support obligations assume the same quality as support and, therefore, enjoy the same exceptions to property exemption as child support and maintenance. We noted that while express, unequivocal exceptions for child support and maintenance exist in the Dissolution Act and the Non-Support of Spouse and Children Act (Non-Support Act) (Ill. Rev. Stat. 1983, ch. 40, ¶ 11021) (the Support Act replaced the Non-Support Act (750 ILCS 28/5 (West 2008))),

---

[6]The Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 *et seq.* (2000)) provides that a QDRO is one mechanism for dividing pension and retirement benefits between the employee spouse and the nonemployee spouse pursuant to a dissolution of marriage. *Thomas*, 339 Ill. App. 3d at 225.

attorney fees do not constitute an exception to the section 12-1006 exemptions. *Jakubik*, 208 Ill. App. 3d at 124. We concluded that "only support obligations enjoy the exception from property exemption." *Id*. at 125.

¶ 59    Further, we noted that the public policy behind section 12-1006 is identical to that behind the Dissolution and Non-Support Acts, namely, that "[t]he property exemptions allow [the] debtor to retain sufficient assets so that he or she may continue to meet family obligations of support, thereby avoiding the public expense of assuming such obligations." *Id*. at 125-26. Finally, we addressed the plaintiff's attorney's argument that, absent the ability to collect awarded fees, a spouse will be unable to obtain representation to protect his or her rights. We noted that the plaintiff's attorney may enforce his judgment against the defendant's nonexempt assets, as may any other creditor, noting:

> "Illinois' public policy favors the payment of child support and maintenance obligations from exempt property to promote the support of the family, not the support of attorneys. Indeed, payment of attorney fees from sources held exempt for family obligations could deplete such resources so as to leave no assets available to satisfy the support obligation itself. The attorney fees as an extension of the exception would thus defeat the support obligation that is the very essence of the exception. The long and well-established public policy enunciated in the Dissolution Act and the Non-Support Act, as well as the property exemption statutes, is to maintain assets for family support. That policy would be subverted, not promoted, if exception to the personal property exemptions was extended to attorney fees." *Id*. at 126.

¶ 60    Similarly, in *In re Marriage of Walsh*, 109 Ill. App. 3d 171 (1982), the appellate court found that the trial court abused its discretion where it ordered the sale of stock jointly owned by the parties, the proceeds of which were to be delivered to the petitioner's attorney. *Id*. at 176. The court found no statutory authority empowering the trial court to order that stock, a marital asset, be sold in order to directly satisfy the payment of fees. *Id*. Instead, the court found that section 508(a) of the Dissolution Act empowers a trial court to order that fees and costs be directly paid to the attorney, who may then enforce the judgment in his or her own name, *not* to order an asset sold for the direct payment of fees. *Id*. at 176-77. Thus, the stock should have been apportioned between the parties. *Id*. at 177; see also *In re Marriage of Campbell*, 261 Ill. App. 3d 483, 490 (1993) (where the court, relying in part on *Walsh*, agreed with the petitioner that a trial court "may not order a marital asset sold in order to satisfy attorney fee obligations"); *Auto Owners Insurance v. Berkshire*, 225 Ill. App. 3d 695, 700 (1992) (assessing the scope of section 12-1006 and noting that federal law, which also protects retirement benefits from attachment or garnishment, permits funds from one plan to be rolled over into another plan but, "[a]s debtors can have no expectation of receiving the funds prior to retirement, creditors cannot expect to satisfy their claims from those assets even when they are payable as a lump sum").

¶ 61    We recognize that the foregoing case law holding that retirement accounts may not be ordered liquidated to satisfy attorney fee awards were all decided prior to the "Leveling of the Playing Field in Divorce Litigation Amendments" to the Act, effective June 1, 1997, through Public Act 89-712 (1997 amendments). The 1997 amendments made interim fee awards available to attorneys for the " 'fundamental reason' " of trying to " 'prevent a party

from using his or her relative wealth as a litigation tool.' [Citation.]" *In re Minor Child Stella*, 353 Ill. App. 3d 415, 420 (2004). In addition to adding the provisions delineating the processes for "leveling the playing field" through interim fee and contribution awards, the amendments added to section 102(5) of the Act, which provides that the Act shall be liberally construed to promote its underlying purposes, including the purpose of "mak[ing] reasonable provision for spouses and minor children during and after litigation, *including provision for the timely awards of interim fees to achieve substantial parity in the parties' access to funds for litigation costs*." (Emphasis added.) 750 ILCS 5/102(5) (2008). One court, in concluding that a premarital agreement waiving attorney fees did *not* constitute a waiver of interim attorney fees, based its decision, in part, on the purpose defined in section 102(5) and the facts that: (1) the interim fee provisions seek to address, where it is shown that one party can pay but the other cannot, the problems that the economically disadvantaged spouse faces in trying to participate adequately in the litigation when the opposing spouse uses his or her greater control of assets or income as a litigation tool; and (2) interim fees are merely an advance against the estate. *Rosenbaum-Golden*, 381 Ill. App. 3d at 74, 77-78.

¶ 62    We conclude that the 1997 amendments, while seeking to prevent the financially disadvantaged spouse from being "outlitigated" by the financially superior spouse, merely overhauled the methods by which and timing of when attorneys may obtain fees; they did not fundamentally alter any of the bases for the rulings in *Jakubik*, *Walsh*, and *Campbell* that section 12-1006 of the Code exempts retirement accounts from attorney fee awards. For example, petitioner has not shown, nor has our research found, that the 1997 amendments in any way added as an explicit exception to section 12-1006 interim or other attorney fee awards (*Jakubik*). The Act, as before the 1997 amendments, provides that an attorney may enforce an award in his or her own name (*Jakubik*, *Walsh*). And the 1997 amendments did not purport to alter the policy as expressed in *Jakubik* that the purpose behind section 12-1006's exemption is, in fact, to ensure that resources remain available to satisfy support obligations. Thus, the 1997 amendments did not alter the courts' conclusions in the foregoing cases that there is no authority for a trial court to order the liquidation and distribution of an IRA to satisfy an attorney fee award.

¶ 63    We note further that the interim fee system's purpose of seeking to level the playing field when one party uses his or her greater control of assets as a litigation tool is not served by liquidating a retirement asset that even respondent could not use in the litigation. While the IRA is an asset that will be distributed in the final disposition of the marital estate, respondent was not during the litigation drawing any funds from the IRA. In other words, where the IRA benefitted *neither* party in the litigation, forcing its liquidation and distribution did not serve to counter respondent's use of an asset because, by virtue of the account's very nature, respondent could have no expectation of accessing it. In contrast, however, and in accord with section 501(c-1)'s reference to determining a petitioning party's need by considering each party's access to assets, respondent did, in fact, tap into the accessible, nonexempt assets when he refinanced the marital home to pay, in part, the first interim fee award. If, after that asset was tapped, there remained no other nonexempt assets from which to draw funds, the Act permitted the trial court to find that both parties lack financial ability and to "allocate[ ] available funds for each party's counsel *** in a manner

that achieves substantial parity between the parties." 750 ILCS 5/501(c-1)(3) (West 2008).

¶ 64    In sum, we conclude that the trial court may not order that an interim fee award be paid by liquidating and distributing the IRA. If petitioner files a new petition for interim fees, the court shall assess respondent's ability to pay without considering the IRA, the disposition of which will be determined in the final allocation of the marital estate. We note, however, that while the IRA is not currently "income" as defined under the Support Act because respondent receives no periodic payment therefrom (750 ILCS 28/15(d) (West 2008)), that would change if respondent voluntarily and prematurely cashes out the IRA. In that case, the court, in determining respondent's ability to pay, may consider the amount that respondent received and, in its final allocation of the marital estate, the court may consider the amount dissipated from the estate in unnecessary taxes and penalties for the premature withdrawal.

¶ 65                              D. Contempt Order Vacated

¶ 66    We vacate the contempt order because we have concluded that the order upon which it is based, the November 6, 2009, interim fee award, is invalid. See, *e.g.*, *In re Marriage of Watling*, 183 Ill. App. 3d 18, 22 (1989) (contempt order vacated when trial court erred in entering the violated child support order); see also *Reda*, 199 Ill. 2d at 63 (reversing contempt finding based on violation of invalid discovery order); *In re Marriage of Bonneau*, 294 Ill. App. 3d 720, 723 (1998) ("where the trial court's discovery order is invalid, a contempt judgment for failure to comply with the discovery order must be reversed").

¶ 67    Moreover, "[i]t is well settled that exposing oneself 'to a finding of contempt is an appropriate method of testing the validity of a court order.' " *Rosenbaum-Golden*, 381 Ill. App. 3d at 82 (quoting *Beyer*, 324 Ill. App. 3d at 321). It is appropriate to vacate a contempt finding on appeal where the refusal to comply with the court's order constitutes a good-faith effort to secure an interpretation of an issue without direct precedent. *Id*. Here, respondent's refusal to liquidate the IRA, based on his belief that the order was legally inappropriate, formed the basis of the contempt order. The foregoing analysis regarding whether IRAs are exempt from judgment to satisfy interim fee awards, particularly in light of the 1997 amendments to the Act, reflects that this issue was without direct precedent. We conclude that respondent's refusal to liquidate the IRA stemmed from a good-faith effort to secure interpretation of this issue. Accordingly, even if the interim fee award were not reversed, we would vacate the contempt finding on this basis.

¶ 68    We note that our resolution of these issues renders it unnecessary for us to reach the remaining issues raised on appeal.

¶ 69                                    III. CONCLUSION

¶ 70    For the foregoing reasons, the judgment of the circuit court of Lake County is reversed, and the contempt order is vacated.

¶ 71    Reversed in part and vacated in part; cause remanded.